Lovey Galentine, Respondent, v. Axel Borglum et al., Appellants.—150 S. W. (2d) 1088.

Kansas City Court of Appeals. April 7, 1941.

1142

*A. F. Harvey* and *Mayer, Conkling & Sprague* for appellants, Axel Borglum, John A. Knudsen and Edward Knudsen.

*J. V. Gaddy* for appellant, William Coe.

*Ernst & Williams* and *Seevers & Hockensmith* for respondent.

1150

1154

SHAIN, P. J.—This is an action for damages for personal injury alleged to have occurred in an automobile collision.

The petition of plaintiff alleged that defendants Borglum, Knudsen and Knudsen were a partnership operating the Center Milk Products Company; that they purchased milk from farmers and transported it to their plant in Maryville, Missouri, in trucks; that William Coe was an employee of the three above-named partners and as such employee of said partnership operated a truck, collected milk from the farmers and transported it to the Center Milk Products Company plant at Maryville; that the truck driven by William Coe for the partnership struck the vehicle in which plaintiff was riding and injured plaintiff. The negligence pleaded was a violation of a pleaded Stanberry ordinance, an excessive rate of speed, a failure by Coe to keep a lookout, a failure to keep the truck under control, a violation of the humanitarian rule.

The petition further alleged as follows:

"1. That defendants, Axel Borglum, John A. Knudsen and Edward Knudsen, at all the times herein were negligent and careless and acted negligently and wrongfully in employing and having defendant William Coe, deliver milk to them at their plant in Maryville, Missouri, in that said defendant, William Coe, was incompetent and his eyesight and vision defective and bad and so defective and bad that said William Coe could not and did not safely drive and operate his said truck in delivering milk to said defendants and said defendant, William Coe, also was negligent and careless and acted negligently and wrongfully in so doing it with his said eye sight and vision being so defective and bad, and all of which facts were well known by all of said defendants at all of said times."

Defendants Borglum, Knudsen and Knudsen admitted they were partners operating and doing business as the Center Milk Products Company and that the company purchased milk from farmers at their Maryville plant. Said defendants however deny all other allegations in plaintiff's petition, and make specific denial that they were engaged in collecting or transporting milk or any product of merchandise by truck or otherwise and specifically deny that defendant, William Coe, was ever their employee for any such purpose. These defendants in effect allege defendant Coe to be an independent contractor over whose actions they had no control. In other words, that the relation of master and servant did not exist between them and Coe. Based upon such allegations, these defendants deny any liability for the injury, if any, suffered by plaintiff.

The defendant Coe answers by way of general denial and plea of contributory negligence.

It will be noted that the plaintiff, while basing his right to recovery on alleged negligent acts of defendant Coe, seeks recovery upon two theories. First, upon the doctrine of *respondeat superior*; Second, upon alleged negligence of the partnership in hiring an unfit person who could not and did not safely drive and operate his said truck.

The record shows that the evidence in the trial was voluminous and the whole field of the relationship between parties defendant was gone into and developed. At the close of all the evidence, the trial court held that the evidence failed to show relationship of master and servant between the partnership and the truck driver, Coe, and the doctrine of *respondeat superior* was eliminated.

The trial court permitted the case to go to the jury only on the issue as plead, *supra,* in regard to alleged employment of an unsafe driver to deliver milk to their plant. There was a jury verdict for plaintiff and against all defendants in the sum of $5000. Judgment was in accordance and separate appeals were allowed for members of the partnership and William Coe.

As the trial of the case was upon the theory that Coe was an independent contractor, then before a recovery is allowable against the partnership in using him to drive and operate his truck in delivering milk to said partners there must be facts and circumstances shown that bring the situation within an exception to the general rule that one is not liable for an injury resulting solely from the negligence of an independent contractor.

There is a doctrine, referred to as nondelegable duty, wherein the owners of premises that may be dangerous due to defective conditions that render them dangerous in work contracted for cannot escape liability unless the owner takes proper precautions to guard against same. Under such circumstances as the aforesaid, the owner cannot absolve himself from liability merely by hiring an independent con-

tractor to do work on same unless he takes proper precaution to guard against such dangers.

There is no evidence in this case that brings the issues herein within the above exception to the general rule.

At the time that the alleged injury to plaintiff occurred, he was riding in a truck owned and being driven by L. B. Skinner. The collision involved occurred in Stanberry, Missouri, on September 10, 1938.

Both the plaintiff and Skinner were called and testified on behalf of plaintiff.

The testimony of the above witnesses is so interspersed by "indication" that it is almost impossible to determine from their testimony in the record as to how the collision occurred. An example of the questions and answers shown is as follows:

"Q. Take the ruler—this is north (indicating on plat)—this west (indicating)—and this is east (indicating). This is First Street and this is Willow Street (indicating). A. We got to coming out here (indicating on plat). Right here is the alley (indicating) and when we came up here—is this 169?"

One Roy Clemmons was an eye witness and testified on behalf of plaintiff and his testimony is the clearest touching the occurrence.

On direct examination of Clemmons, the following appears:

"Q. Were you where you could see both cars? A. Yes, sir.

"Q. I wish you would tell the court and jury how you saw the collision and what occurred there? A. I was standing talking to a fellow and seen a car coming from the east and seen this car going north and this truck came down there and seemed to be over half way across the street.

"Q. Which car? A. Skinner's.

"Q. Skinner's was half way across the intersection? A. Yes, half way or over.

"Q. What do you say about where was he with reference to the intersection—the Skinner car? A. Right south.

"Q. I don't know whether you understand me. When you first looked up where was Skinner's car? A. Going north.

"Q. Where was it with reference to the center of the intersection? A. A little over half across the street going north—no, going west.

"Q. Where was the Coe truck at that time? A. It was coming down the street, a little over half way from the oil station.

"Q. About half way down the block? A. Yes, sir.

"Q. How fast was the Coe truck going? A. I don't know exactly.

"Q. How fast would you say it was coming? A. I imagine about forty miles.

"Q. Did you hear any warning sounded from the Coe truck? A. No, sir.

"Q. Did you see Coe's truck collide with the Skinner truck? A. Yes.

"Q. Where did they collide with reference to the depression? A. Whereabouts?

"Q. Yes. A. It hit the Skinner car there before it got across the street.

"Q. Hit the back end of the Skinner car? A. Yes, sir."

On cross-examination, the following appears:

"Q. You want to say the Coe car was going forty miles an hour, down hill, with a load of about four tons of milk on it, and hit this car and only knocked it over about ten feet? A. Seemed like he threw his brakes on it.

"Q. But it knocked it about eight or ten feet? A. Well that far, anyhow."

That the plaintiff received injury is not disputed.

The evidence discloses that defendant Coe, the milk truck driver, had very defective vision without eye glasses. However, he wore heavy lense glasses that evidence discloses gave good vision. The evidence further discloses that Coe had been in several previous automobile accidents.

From a study of all of the evidence we conclude that the evidence clearly makes an issue of fact on the question of negligence on part of defendant Coe.

The liability of the partners of the Center Milk Products Company is, of course, based upon different principles of law and must be substantiated by different facts than apply to defendant Coe.

Regardless of the rulings of the trial court, it becomes the duty upon review to study the evidence and determine therefrom as to whether or not the members of the partnership are liable to the plaintiff on any theory consistent with the pleadings.

It stands admitted that defendants Axel Borglum, John A. Knudsen and Edward Knudsen are partners operating the Milk Products Company of Maryville, Missouri. In the operation of the business it is shown that what are known as milk routes had been established in the surrounding territory and farmers selling milk to the company would deliver their milk along the highway over which a route operated, and same would be picked up by one operating on the route and deliver same to the plant in Maryville.

Under the practice established in the trade, the Milk Products Company furnished the milk cans to the farmers and it was the duty of the carrier on the route to pick up the full cans and take same to the plant and to return empty containers back to the farmers on the route.

Under the practice at the time of the occurrence herein in issue, the compensation to the carrier on the route was paid jointly by the company and the farmers selling milk.

It appears that one Lon Messner owned what was called a "milk route" over which he collected milk from the farmers or producers for the company. Defendant Coe had worked for Messner for a year and three months when Coe purchased a part of the milk route from Messner, together with certain trucks and equipment. Coe borrowed from the company $885 of the $1050 necessary to pay Messner. Coe made the purchase from Messner on August 3, 1938, and continued to collect milk from the customers of the company by the use of the trucks he had purchased from Messner. Coe had no written contract with the company, but the agreement was that he receive twenty-five cents per hundred pounds for collecting milk. This sum was made up of twenty-two cents per hundred pounds which the company retained from the customers' paychecks with which the milk was paid for and three cents per hundred pounds which it contributed. It appears at times that the company's portion of the recompense received by Coe was eight cents, making Coe's recompense a total of thirty cents per hundred pounds. Coe had no contract with the producers.

The company owned the milk cans in which the milk was brought to the creamery. It had a number for each customer, which number was placed upon the particular customer's milk cans. The company charged the customers a rental of twelve and one-half cents per month for each can. The recompense Coe received included the work of delivering cans back to the customers. The company deducted from the producer's check the amount charged for the cans, twenty-two cents hauling charges and the price of whatever of its products the customer had bought of the company during the period for which amount the check was given. Settlement was made bimonthly. Coe would deliver the checks.

Coe delivered large quantities of ice cream for the company for which he was paid by the company five cents per gallon, which included his services in returning the containers. He also delivered butter milk in quart bottles and in other containers and he was paid ten cents for the delivery of each box of six quarts of butter milk. Coe would also deliver to the company's customers other products it manufactured, for which he received payment from the company, but how much he received for these items, in whole or in part, is not shown by the testimony.

Aside from collecting milk and delivering milk products for the company, Coe hauled merchandise for various other customers of his, with which the company had no connection. Coe maintained his own trucks, bought the gasoline for them and paid his own helpers and operated his milk route. There was no sign of any kind on the truck and there is no evidence that the company ever attempted to direct him as to how he should drive them. The only evidence of any directions given him was that he must have the milk at the com-

pany's plant by noon in the summertime and by 1:30 in the winter unless he was delayed by the weather. One of the partners testified that "general demand" was made on Coe to this effect. In the course of the work customers would ask Coe to procure special tests of their milk, which were made by the company and the report thereof delivered back to the customers by Coe. In the envelopes containing the checks delivered by Coe there sometimes were inserted by the company circulars. Some of these circulars advertised strainers and strainer pads offered by the company for sale. Coe would also deliver the strainers and strainer pads to the customers which they had purchased from the company. At least on one occasion Coe bought butter and butter milk from the company and resold it to his own customer. The inference to be drawn from the testimony is that Coe would also take orders from the customers for products sold by the company as, at the time of the collision in question, he was on his way to one of the ice cream customers of the company in Stanberry to find out if it desired any ice cream. When the customer would order products from the company it would send a bill along with the goods which Coe delivered. Coe also delivered products of the company to persons who did not sell milk to it. The company's customers were secured by the customer calling its plant in Maryville and asking it to have the milk carrier in the particular customer's territory come and pick up his milk and the company would tell Coe about the milk in his territory and he would go and get it. People on milk route would send by Coe for needed merchandise and Coe would go to merchants dealing in product ordered and get and deliver same to the one employing him for such service.

At the time of the collision Coe had no permit of any kind from the State to operate his trucks. The license plates on the truck in question were the plates issued to Messner. None had been issued to Coe. After the collision the company wrote its customers stating: *"In order to classify our Milk Haulers as Independent operators,* hauling milk direct from the farm to market, we have been obliged to change our method of paying for the milk" (italics ours) and stating, in effect, the new method was that the customer would be charged the entire cost of collecting the milk, the company paying no part thereof.

In reference to Coe's incompetency the evidence shows that he had been operating motor vehicles for some years; that he had driven various trucks aggregating at least 300,000 miles prior to the time of the collision; that he had driven the particular truck involved in the collision some 100,000 miles; that the company knew of him through his driving for Messner and thought he was a "good boy" when he purchased the milk route, but made no special investigation of his qualifications for driving a truck.

The evidence shows that after the collision in question another automobile ran into Coe's truck in Spencer, Iowa, when Coe's truck was

"torn up pretty bad;" that he had been sued in Iowa on account of this collision; that prior to the collision in question (the time not being shown) Frank Lykins' daughter ran her car into his truck, "she didn't stop for a sign;" that he had another collision with Oliver Jennings' car (the time not being shown) in which his truck and the Jennings car "ran together;" that at another time he was driving his truck with a guest seated therein. The guest testified that they were crossing a bridge which had no "bannisters" and that Coe drove near to the edge of the bridge instead of in the middle.

Coe testified that he did not see the truck in which plaintiff was riding until he was within twenty-five feet thereof, but that his view was obstructed by trees. It is admitted that there is sufficient evidence in the record tending to show that Coe was negligent in connection with the collision in which plaintiff was injured.

At the time of the trial, which occurred on March 20, 1940, Coe was thirty-four years of age. He had worn glasses since he was eight years of age. At the time of the collision he was wearing glasses with thick lenses which had been fitted about six years before. His right eye had been injured when he was a year and a half old through a fall. He had an astigmatism in his eyes that caused his eyeballs to be unround. One of his eyes was so crossed that he looked out of its corner. His eyes were tested about three months before the trial, or about a year and a half after the collision in question. The doctor who tested them advised him to have his glasses changed "before long." He said the "lens is scratched on my glasses" and "I really should have my eyes rechecked." There was other testimony that his glasses had been scratched prior to the collision in question and that while he did not need the lenses changed, they needed re-grinding.

On cross-examination counsel for plaintiff conducted a test of the ability of Coe to see without his glasses. The test showed that while he could read and see letters at a close distance he was unable to distinguish letters a few feet away and could not read without making some mistakes. However, with his glasses he was able to read normally. There was medical testimony to the effect that by reason of the injury Coe had suffered in childhood to his eye, his right eye was what is called "walleyed;" that without glasses Coe's eyes were four-fifths normal but that with his glasses he had normal eyesight; that astigmatism is a common condition, not a disease; that it is present in many people's eyes and that many people who have astigmatism drive cars without being incapacitated from doing so.

As this case was submitted only upon the allegations of negligent hiring of an independent contractor and as defendants assign as error the refusal of the court to give directed verdict in their behalf, we now proceed to review as to such assignment.

We have above referred to the rule that one who owns property that may under circumstances become dangerous cannot escape

liability incident to property by employing an independent contractor. In other words, one cannot delegate a duty and escape liability for injury incident to his proprietorship. However, if injury occurs by sole negligence of the independent contractor and is not due to or connected in any way with the premises, the contractee is not as a rule liable for negligence of the independent contractor.

As to the employment of a servant, the great weight of authority is to the effect that duty to inquire into competency and fitness exists.

In 39 Corpus Juris, under heading of Master and Servant, section 1950, page 139, the following text appears:

"While there is some authority to the contrary, according to the weight of authority the duty rests on the employer to select a skilled and competent contractor, and the employer is in general liable to third persons for the negligent or wrongful acts of an independent contractor employed by him where he knew his character for negligence, recklessness, or incompetency at the time he employed him."

The plaintiff herein in one paragraph has plead the relation of master and servant and in another paragraph set forth above had directly plead negligence in employing Coe, an alleged unfit person, in general terms.

If the relation of master and servant exists the fact that the allegation of negligence in hiring appears in another paragraph does not preclude consideration from the standpoint of master and servant. However, if the doctrine of *respondeat superior* be eliminated, quite a different question arises.

The text above, although appearing under Master and Servant, is very broad and as to whether or not it applies to the facts of the case at bar, regardless of whether master and servant or independent contractor be involved calls for consideration.

There are many cases in Missouri wherein the nondelegable duty has been declared concerning work done by an independent contractor on one's premises (discussed by us, *supra*). However, there are only two Missouri cases cited in *Corpus Juris* under the text, *supra*. One case cited is Mullich v. Brocker, 119 Mo. App. 332; the other Missouri case cited is Bannock v. Elmore, 114 Mo. 55, which clearly comes under the rule as to owner of premises.

Upon an examination of the Mullich v. Brocker case, we find that the issue was determined under the doctrine of *respondeat superior*. However, in the course of the opinion there appears the statement of doctrine similar to that found in *Corpus Juris, supra*.

The facts of the Mullich case are that Brocker hired a sixteen-year-old boy to break a colt and the colt ran into a team of horses and caused injury. The opinion holds that the relation of master and servant existed and liability was placed upon that ground.

In the course of the opinion, the court discourses as follows:

"But a proprietor will not be exonerated from liability for negligence in the doing of work which he lets out to an independent contractor unless he used care to select a competent person as contractor— one who not only had an occupation, but reasonable skill in performing the tasks pertaining to it. If a person entrusts the performance of work, of a kind likely to result in harm to third persons unless cautiously and skillfully done, to a manifestly unfit person, as an independent contractor, the employer will be responsible for the consequences of such contractor's incompetency. Breaking horses to harness is not necessarily dangerous to others, if properly done; and in selecting a contractor to do work of that character, a proprietor need only use ordinary care to choose a competent person. But if he is careless in selecting, he remains liable. [Dillion v. Hunt, 82 Mo. 150, 155; Brannock v. Elmore, 114 Mo. 55, 62, 21 S. W. 451; Burns v. McDonald, 57 Mo. App. 599]."

As in the above case, plaintiff based his cause of action in two paragraphs; one on the issue of master and servant, and one on allegation on negligence in employing an incompetent person to break the colt.

It must be noted that as under our law negligence in the employment of a servant imposes liability upon the master and therefore all that is said in the above opinion, in the light of the fact that the court held that the boy was not an independent contractor, may well be considered as applying to relation of master and servant.

The use of the word "proprietor" (the owner of the horse) in the above quotation is significant and the further fact that citations inserted are all cases coming within the rule of nondelegable duty as first discussed by us, *supra,* is indicative of the conclusion that the court placed liability on two grounds. First, on *respondeat superior*; and second, on the principle first discussed by us to proprietor or owners of premises.

The case herein under consideration has distinguishing features from the Mullich v. Broker case, in that defendants Borglum, Knudsen and Knudsen, were neither the proprietors or owners of the milk route or the transporting trucks used.

No case is cited and we find no case wherein one who hires an independent contractor, engaged in hauling and delivery of goods for hire, is held liable for damages done to others by such independent contractor.

We have taken occasion to run down the citations in the footnotes to the text of *Corpus Juris,* set forth above, and find that in every instance the liability of the contractee is based upon the proprietorship or ownership of the instrumentality that caused the injury or liable under rule as to master and servant.

After a somewhat exhaustive research, we conclude that the facts of the case at bar do not bring it within the "weight of authority" rule as expressed in the text of 39 *Corpus Juris, supra.*

To hold that one who engages an independent contractor who follows the business of hauling goods and merchandise for hire is under the duty to inquire and ascertain the qualifications of such a person or else be liable for damages for injury inflicted by the negligence alone of such person, would inflict unwarranted burdens on innocent people. If such were the rule, any citizen who telephoned to such a person to haul his trunk to the depot would subject himself to the possibility of answering an action and must defend on the ground that he had made diligent research as to the capability and qualifications of the person before calling him to perform the transportation.

In reaching the above conclusion, it must be understood as applying to an independent contractor and not to master and servant. Further, in reaching the above conclusion, we have had in mind the rule that a contractee who interferes with the work being done by an independent contractor, and thereby injury is occasioned the contractee is liable. The evidence in this case shows no such interference as contributed to the collision and injury.

If the trial court was right in eliminating the issue of *respondeat superior,* it follows that as to defendant Borglum, Knudsen and Knudsen, a demurrer should have been sustained as to them on grounds stated above. However, there is another ground upon which the above conclusion can be based. In the text, 39 *Corpus Juris, supra,* the following rule is laid down:

"The fact that a contractor is negligent in respects to the work in question raises no presumption that the employer was guilty of negligence in employing him."

Even if it be concluded that the exception to the general rule, *supra,* has application to the facts of this case, we conclude that there is no evidence in the case tending to show that the company failed to exercise reasonable care in Coe's selection or, in fact, that Coe was incompetent to drive the truck in question. As to the collisions he had suffered with other vehicles, at least one of them occurred after the collision in question. The time and circumstances of the others are not shown and, of course, there is no showing that Coe was negligent in any respect in connection with any of them. [Dysart v. Railroad Co., 145 Mo. 83; Burns v. McDonald Mfg. Co., 213 Mo. 640.] Of course, there was nothing to show that the members of the partnership knew anything about the other collisions when they secured his services on his milk route or prior to the collision in question. There is no evidence that Coe, by the aid of his glasses, was incompetent from the standpoint of vision, to drive the truck in question.

Under our conclusions stated above, a reversal must be had as to defendants Borglum, Knudsen and Knudsen. However, if as to these defendants there is any ground stated in plaintiff's petition that en-

titled plaintiff to recover from these defendants, then the question of remanding for another trial must be considered. In other words, if we should conclude from a study of the evidence that plaintiff is entitled to go to the jury on the issue of master and servant, this cause should be remanded.

We have set forth above a synopsis of the evidence that we conclude states the facts as to the contractual and working relationship between the Milk Products Company and defendant Coe, as same existed at the time of the occurrence herein complained of. Basing our conclusion from a study of the record, we conclude that the plaintiff failed to make a submissible case under the doctrine of *respondeat superior*. However, in fairness to the plaintiff, one further fact in evidence, what we referred to above, should be noted and considered.

It appears that after the happening of the collision herein involved, the Milk Products Company sent out to its customers a letter as follows:

"Customer:

"In order to classify our Milk Haulers as Independent Operators, hauling milk direct from the farm to market, we have been obliged to change our method of paying for milk.

"By this new method we are increasing the regular market price of milk two cents per pound butter fat and deducting the full amount of the hauling charge from the patron.

"It does not change the rate that the Haulers have been getting or it will not increase the rate they will get under the new method. Up to this time the Company itself has been paying part of the hauling charge, to the extent of two cents per pound butterfat, thus paying a lower price for milk.

"So, with reference to this last period we paid thirty-three cents per pound butterfat in place of thirty-one cents as it would have been under the old method according to the market.

"In the future we will continue to operate under this plan.

"Center Milk Products Company."

The question arises as to whether or not there appears in the above letter such admissions as when considered with all other evidence in the case would make a submissible issue as to existence of relation of master and servant. We conclude not, and for the following reasons: The letter is but an exemplification of confusion that would be occasioned in the business world if there be declared a duty imposing liability based upon negligence in failure to ascertain as to skill and suitable qualification of an independent truck or dray driver before one entrusted them with an article to be transported to or from their home or place of business.

Evidently the partners involved came to the erroneous conclusion of law that the Milk Products Company by paying part of the hire

for defendant Coe's services in hauling the producers product to the plant imposed greater liability upon the partnership for the acts of Coe than would be imposed if such practice was not followed. Such erroneous conclusion of law does not impose any greater liability than existed before the letter was written.

Based upon the above and other stated conclusions herein, it follows that there should be an outright reversal of the judgment as to defendants Axel Borglum, John A. Knudsen and Edward Knudsen.

Defendant William Coe filed separate affidavit for appeal and has filed separate brief. We have above stated our conclusion to the effect that the evidence makes a submissible case as to Coe.

It is insisted that the court erred in giving plaintiff's Instruction No. II, which authorized the jury to allow plaintiff damages for the loss of past and future earnings. The evidence in this connection shows that plaintiff suffered from a bad heart and dropsy prior to the collision and that he used a "little stick" to walk around with; that his heart was in such condition that the slightest exertion troubled him. His physician testified that plaintiff might have been able to do some light work but he advised him "against it." Plaintiff testified that prior to the collision he did "any work that came up;" that he shucked and cut corn, tended a large garden, worked in a blue grass patch, painted a seven-room house, a big tool shed and a barn.

There is no question but that, as a result of the collision in question whatever earning capacity, if any, plaintiff had was diminished, but there is no evidence what he was able to earn either before or after the collision. The instruction was clearly erroneous. [Chilcutt v. LeClair, 119 S. W. (2d) 1; Davidson v. Transit Co., 211 Mo. 320, 344, 345, 346.]

The defendant Coe also makes the point that the measure of damages instruction was erroneous as to him. This contention must be sustained and the cause reversed and remanded as to Coe.

Judgment reversed as to defendants Axel Borglum, John A. Knudsen and Edward Knudsen and, for reasons stated, judgment as to William Coe is reversed and cause as to him remanded.

*Bland, J.*, concurs; *Cave, J.*, in result.