Robert J. STEELE et al., Appellants,

v.

ARMOUR AND COMPANY, Appellee.

No. 77–1694.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 13, 1978.

Decided July 28, 1978.

Rehearing and Rehearing En Banc
Denied Aug. 18, 1978.

Before BRIGHT and HENLEY, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

The case presented arises out of an automobile accident. It comes to the federal courts under our diversity jurisdiction.[1] On May 26, 1975, a tractor-trailer collided with a van carrying plaintiff, Robert J. Steele, and his family. Steele was rendered a paraplegic, his wife was killed, and his son was seriously injured. Three separate actions were filed for personal injuries and wrongful death. These actions were consolidated and transferred to the United States District Court for the Eastern District of Missouri, Southeastern Division. For convenience we will refer to the three plaintiffs in the singular as the plaintiff.

The District Court[2] granted defendant Armour and Company's (Armour's) motion for summary judgment.[3] Our only question on this appeal is whether, in so doing, the District Court erred. We hold not and affirm.

With respect to Armour three general legal theories are advanced for recovery: a) *respondeat superior*, b) joint venture, and c) enterprise liability, plaintiff including therein what he referred to as "negligent entrustment or mere instrumentality rule."

We recognize at the outset, as we recently held[4] that under Fed.R.Civ.P. 56(c),

While a party who moves for summary judgment has a heavy burden of persuasion, nevertheless, his motion should be granted if the district court is satisfied to the requisite degree of certainty that the record presents no genuine issue as to a

Peter G. Tamulonis, Kightlinger, Young, Gray & DeTrude, Indianapolis, Ind. (argued), Aribert L. Young and Howard J. DeTrude, Jr., Indianapolis, Ind., on brief, for appellants.

John L. Oliver, Jr., Oliver, Oliver & Jones, P. C., Cape Girardeau, Mo., argued and on brief, for appellee.

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 28 U.S.C. § 1332.

2. The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri.

3. After extensive discovery, Armour filed its motion for summary judgment. This motion was initially denied, but upon Armour's appli-

cation for reconsideration the District Court granted the motion. Plaintiff's subsequent motion for reconsideration was denied, and on August 4, 1977, the District Court directed that summary judgment in favor of Armour be entered as a final judgment pursuant to Fed.R.Civ.P. 54(b).

4. *Percival v. General Motors Corp.*, 539 F.2d 1126, 1129 (8th Cir. 1976).

material fact and that the movant is entitled to judgment as a matter of law. As we said in *Lyons v. Board of Ed. of Charleston, etc.,* 523 F.2d 340, 347 (8th Cir. 1975):

> Thus, although we have repeatedly emphasized that summary judgment is an extreme remedy, not to be employed unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances, *Ozark Milling Co., Inc. v. Allied Mills, Inc.,* 480 F.2d 1014 (8th Cir. 1973) and cases therein cited, we recognize as well, its salutary purpose in avoiding a useless, expensive, and time consuming trial where there is no genuine, material fact issue to be tried.

Armour operated a meat processing plant at Memphis, Tennessee, where hogs and cattle were slaughtered and processed. It required substantial quantities of livestock for these operations. It did not, however, haul livestock on the hoof. For purposes of such supply some seventy to eighty different carriers have hauled livestock to it over the past decade.

The acquisition of cattle by defendant Armour and Company as distinct from hogs,[5] was handled in several ways. In the case before us an "order buyer," Mr. Gordon Price of Pana, Illinois, was used. Generally speaking, an "order buyer" purchases cattle upon order from various meat packers as requested, if he is able and willing to fill the order.

Mr. Price received an order from Mr. King, Armour's head cattle buyer, for cattle of a certain grade to be purchased at a certain price. Mr. Price arranged the purchase of two truckloads from an Illinois auction barn. He then called J.J. Truck Line (hereafter J.J.) of Memphis to deliver the cattle to Armour's slaughter house and meat processing plant in the Memphis stockyards in Memphis, Tennessee.[6] It was on the Missouri portion of this trip that the accident occurred. Our questions concern the asserted vicarious liability of Armour.[7]

■ The plaintiff concedes that the burden is on him "to establish the existence of an agency relationship between Armour and the other defendants,"[8] but it is pertinent to observe in this regard that under general principles of agency, as well as under Missouri law, a showing of agency, *simpliciter,* is not enough for the imposition of vicarious liability. The required showing is more specific and demanding. The Missouri law in this area is accurately stated in the commentary to Missouri Approved Instruction No. 13.01:

> It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental physical acts of negligence in the performance of duties committed by an agent who is not a servant.

The Missouri Supreme Court has defined an independent contractor as "a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's right to control

---

**5.** The two operations are to be distinguished. Cattle buying, as here, was accomplished almost exclusively by independent order buyers, whereas more of the hog purchases were made by salaried Armour employees or made directly from the hog producers. This pattern was reflected in the difference in the transportation arrangements made. Armour used the same printed shipping "contract" form in both the cattle and hog departments, but its employment in each was different. In the cattle department, the form was generally filled in after the trip and used for recordkeeping purposes only. In the hog buying department, it was often filled out in advance, since Armour gener-

ally directly engaged the trucker to pick up and transport hogs that it had already purchased. We do not explore the hog buying operation in detail since that operation is not before us.

**6.** The cost of transportation was paid on a weight basis, the rate having been negotiated in advance. On resale of the cattle to Armour, the buyer was paid a commission of 25 cents per head.

**7.** The parties appear to agree that Missouri law controls.

**8.** Plaintiff's Brief at 31.

with respect to his physical conduct in the performance of his undertaking." [9] "[He] is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, without being subject to the control of his employer except as to the result of his work." [10] In each case the court confronts a specific transaction, and it is abundantly clear that the issue for the court relates to the "very transaction out of which the injury arose" [11] and not some other, though in some respects similar.

Sundry elements and circumstances enter into the determination of the actual relationship; ordinarily, no one of these is alone conclusive, and all must be viewed to see whether control, or a right of control, has been retained over the supposed employee's physical conduct and the details of the work. [12]

 The relationships between the principal parties before us are controlling in our determination of the questions presented, and we have examined them in detail. Mr. King, Armour's head cattle buyer, was not significantly involved. He contacted Mr. Price, a cattle buyer who buys and sells for many packers, some eight to ten in number, including Armour, and ordered certain cattle. The ordered cattle were purchased, paid for by Price, following the parties' usual practice, and resold, upon delivery in Memphis, to the Armour facility. It was the cattle buyer's obligation to deliver the cattle in what is referred to as "delivered condition," i. e., the buyer was to arrange for and provide delivery to Armour. He retained title and constructive possession until he was paid.

When the load reached its destination in Memphis, a printed form supplied by Armour was made out. Entitled "Motor Carrier Livestock Contract," the form listed the weight of the cattle, where they were from, who hauled them, and the freight rate. This computation went to the "main office," and Armour issued its check for the amount owed by it.

On the reverse side of the form the carrier agrees that the transportation "is performed in accordance with the exemption contained in Part II Section 203(b) par. 6 of the Interstate Commerce Act" and further agrees that "no non-exempt tonnage will be transported with Armour loads." [13]

It is clear that the form employed by Armour is a recordkeeping device. It is not a contract for transportation. It is not filled out until the trip is over. But even if it were a contract for transportation neither it nor any other element in the evidence in the case suggests control by Armour. The regulations on the back of this form emanate from Federal regulation, not from Armour.

Armour had no control over the order buyer's arrangement of transportation. In particular, it did not tell Price whom to use for transportation, he being free to choose carriers of his choice, though most of the time he used J.J. Armour did not know when or whether Price had filled an order, or whether Price had called J.J., or anyone else, to transport it.

It is clear on this record that Armour had nothing to do with Price's choice of J.J. for this load. Price testified that he gave J.J. most of the trucking "because he gave me good service." Armour paid the freight as part of the negotiated "deal." Plaintiff argues that Price was Armour's "agent" with authority to arrange delivery. There

9. *Skidmore v. Haggard*, 341 Mo. 837, 844–45, 110 S.W.2d 726, 729–30 (1937).

10. *Flori v. Dolph*, 192 S.W. 949, 950–51 (Mo. 1917).

11. *Usrey v. Dr. Pepper Bottling Co.*, 385 S.W.2d 335, 338 (Mo.App.1964).

12. *Talley v. Bowen Construction Co.*, 340 S.W.2d 701, 704 (Mo.1960).

13. These statutory provisions relate to 49 U.S.C. § 303(b)(6), which exempts "motor vehicles used in carrying property consisting of ordinary livestock * * * or agricultural * * * commodities" from Interstate Commerce Commission regulation as long as "such motor vehicles are not used in carrying any other property, or passengers, for compensation * * *."

is no evidence to support this position. Price was a broker, and properly so characterized by the trial court. It is significant that there is no evidence that Armour had anything to do with the shipment, its method, manner, or any detail thereof.[14] It was well put in *Wigger v. Consumers Cooperative Ass'n*, 301 S.W.2d 56 (Mo.App.1957) that

> The courts have many times held that in determining whether the relationship of master and servant or employer and employee exists, one of the essential or primary elements is the right to control the means and manner of service as distinguished from controlling the ultimate results of the service. * * * However, it is equally well established that every case has been decided on its particular facts and while the element of control is of the greatest significance in determining the existence of the required relationship, the fact of control standing alone is not conclusive.

*Id.* at 60 (citations omitted). Likewise in *Coul v. George B. Peck Dry Goods Co.*, 326 Mo. 870, 874, 32 S.W.2d 758, 759 (1930) (en banc) the court stated

> Personal service is a marked characteristic of the relationship of master and servant. In the performance of his services, Hubbs not only had the right to use his own or such other vehicle as he chose, but to employ another to drive the same. The right of substitution does not connote personal service; on the contrary, it is indicative of an independent contractual relationship.[15]

Against all of this plaintiff counters with general principles of agency, with which we have no quarrel. But nothing specific, applicable to this particular incident, is cited to us.[16] It was the conclusion of the trial judge that "[p]laintiffs have offered no evidence whatsoever to indicate that Armour had any control over the time or manner of shipment." We concur.

■ Examination of the record negates the plaintiff's claim of an agency relationship between Armour and J.J. The trucking line was operated by Mr. Jackson, with his wife's aid. Jackson had no partners. He owned and operated the equipment, both tractors and trailers, and maintained the machines in his own shop. He hired and fired and set the operating schedules. He solicited employment on a daily basis from Armour and some three or four other packers in the area, although Armour hauls comprised a large part of J.J.'s business. These packers he served on a "first come, first served" basis, rejecting latecomers, Armour as well as others, if J.J. was already employed to capacity. He had various regulatory permits, in his own name, where such permits were required.[17] He ran what is commonly referred to as a "one-man" business.

In all of this we find no control by Armour over or any right to control J.J.'s trucking. The nearest approach to "control" over J.J. was the carrier's acquiescence in Armour's occasional request that the load be delivered (if short of stock) in time for the "morning kill." This is a matter of scheduling, and at the most pertains to the result to be attained in the job undertaken, not in the details of its accomplishment.[18]

The short of it is that J.J. was an independent trucker, uncontrolled by Armour,

---

**14.** Obviously, Armour was interested in obtaining the cattle in good physical condition, but contrary to the arguments of the plaintiff, there is no evidence that Armour specified any details in the manner, method, or routes of shipment.

**15.** *See also, Talley v. Bowen Construction Co., supra* at 705.

**16.** *See* Fed.R.Civ.P. 56(e).

**17.** Jackson had obtained livestock hauling permits from the states of Illinois, Missouri, Kentucky and Tennessee. Since Jackson hauled only livestock, he was exempt from general I.C.C. regulation. *See* n. 13, *supra.*

**18.** "The control of the work reserved in the employer which makes the employee a mere servant is a control, not only of the result of the work but also of the means and manner of the performance thereof." *Kourik v. English*, 340 Mo. 367, 376, 100 S.W.2d 901, 904 (1936) (citation omitted).

and Armour was a stranger to the negligence, if any, of J.J.'s truck driver.

 Plaintiff, in arguing that "a colorable claim based upon principles of *respondeat superior* is made" invites our attention to several factors, among others, the large volume of business done by J.J. for Armour. But the critical inquiry in this area is not volume but whether the business, whatever its volume, is done under the control of the employer, or under his "right to control." The element of control required must extend to the "means and manner of service" as distinguished from controlling the "ultimate results of the service."[19] Control over the "means and manner" of J.J.'s performance was vested solely in James Jackson, not in Armour. The Supreme Court of Missouri has addressed the factor of volume of business in *Rutherford v. Tobin Quarries*, 336 Mo. 1171, 1178, 82 S.W.2d 918, 922 (1930), holding that "[n]o reason is seen why a man may not agree as independent contractor to deliver all or part \* \* \* of the goods sold by a merchant, if the method and means for doing so are left entirely to him without any right of control by the employer."

 The plaintiff argues that Armour "could be held liable if it were found that it failed to exercise reasonable care in selecting a competent, experienced, and careful cattle hauler and driver."[20] The argument is hypothetical. There is no evidence that Armour entrusted the driver of the truck with the vehicle.[21] Nor is there any evidence that J.J. had a poor driving record or was otherwise incompetent.[22]

 It is argued, as well, that a joint enterprise existed between Armour and J.J. Truck Line. The primary problem here, as respects the imposition of liability against Armour, lies in the deficiencies in the facts. There are no facts supporting plaintiff's claim of a "mutual right to a voice in the direction of the hauling enterprise."[23] The parties have raised and briefed many additional points regarding the relationship between Armour and J.J. However, in view of the dispositive effect of the foregoing, we deem it unnecessary to extend this already lengthy opinion by discussing them in detail.

It would serve no useful purpose to dissect the host of cases submitted to us in view of our holdings as heretofore stated. The plain fact of the matter is that there is no evidence that Armour either had control or the right to control the truck involved in this accident, or that it possessed or exercised any other quality or characteristic of supervision or participation that would justify a holding of vicarious liability under the applicable precedents.

Affirmed.

---

19. *Wigger v. Consumers Cooperative Ass'n, supra.*

20. Plaintiff's Brief at 47.

21. *See Evans v. Allen Auto Rental and Truck Leasing, Inc.,* 555 S.W.2d 325, 326 (Mo.1977) (en banc).

22. We do not rule upon whether a "negligent entrustment doctrine applies to contract haulers of goods." In this regard, *see Galentine v. Borglum,* 235 Mo.App. 1141, 1164, 150 S.W.2d 1088, 1094 (1941), where the court held:

> To hold that one who engages an independent contractor who follows the business of hauling goods and merchandise for hire is under the duty to inquire and ascertain the qualifications of such a person or else be liable for damages for injury inflicted by the negligence alone of such person, would inflict unwarranted burdens on innocent people. If such were the rule, any citizen who telephoned to such a person to haul his truck to the depot would subject himself to the possibility of answering an action and must defend on the ground that he had made diligent research as to the capability and qualifications of the person before calling him to perform the transportation.

23. Plaintiff's Brief at 45. Plaintiff's case, cited in support, *Allegheny Airlines, Inc. v. United States,* 504 F.2d 104 (7th Cir. 1974) is inapposite. There the court found, among other distinguishing factors, that each party had an equal right to direct and control the conduct of the other.