**John MERRILL, Libelant,**

**v.**

**THE S.S. CUACO, her engines, tackle and gear, and any and all persons claiming any interest therein, and Gavoita Cia. de Nav., S.A., of Panama, Owners, operators and/or charterers, Respondents.**

**Civ. No. 214-59.**

United States District Court
D. Oregon.

Dec. 2, 1960.

7. Complaint, par. 3.

322

Peterson, Pozzi & Lent, Frank Pozzi, Portland, Or., for libelant.

Kenneth E. Roberts, Mautz, Souther, Spaulding, Denecke & Kinsey, Portland, Or., for respondents.

KILKENNY, District Judge.

Suit in admiralty to recover for personal injuries sustained by libelant on June 1, 1959, while working as a longshoreman aboard the S. S. Cuaco.[1] Said ship was moored in Portland, Oregon. He charges respondents with unseaworthiness and negligence. Libelant was employed by Portland Stevedore Company.[2] The company contracted with respondents, owners, to line the vessel preparatory to loading a bulk cargo of grain. The lumber was purchased by the company, stockpiled at said terminal, taken to the side of the vessel and hoisted

1. Herein called "vessel".

2. Herein called "company".

aboard. Libelant was the gang boss of the men engaged to line the vessel. The lumber was 2 x 12, approximately 10 feet in length. Although this lumber was placed aboard for lining, it was necessary to use a portion thereof to cover the deep tank openings so that the longshoremen could proceed to erect a midships bulkhead. The plaintiff observed that this lumber was knotty. He was in charge of the gang which was placing the lumber over the opening of the deep tank. The lumber was new, but was No. 3 grade. This type of lumber had been used for many years in lining ships. The libelant never examined the lumber after it had been lowered into the hold or prior to the time it had been laid across the deep tank opening. The evidence is in dispute as to whether there was a general usage or custom on the covers being removed from the deep tank when the ship arrives in port. It was necessary to place this lumber over the deep tank in order to erect the centerline bulkhead which was part of the lining to be placed in the ship by libelant and his gang. The lumber in question was being used as a cover for the deep tank at the time of the occurrence and was to be used thereafter as part of the lining of the ship. After the 2 x 12s had been placed over the opening, the libelant walked on such lumber in the line of his duty as gang boss and in direction of his gang. While there, one of the knotty boards being too weak to support libelant's weight, collapsed, causing libelant to fall into the deep tank and sustain injuries as hereinafter mentioned.

Respondents raise three points on the question of liability.

I. That the lumber used by libelant to cover the deep tank opening did not become part of or appurtenant to the vessel and therefore did not make the vessel unseaworthy, even though the particular lumber may have been defective.

■ Defective equipment furnished by the stevedore is the responsibility of the shipowner and where the condition was a proximate cause of the occurrence, as it is here, the shipowner is liable on its warranty of seaworthiness. Petterson v. Alaska S. S. Co., Inc., 9 Cir., 1953, 205 F.2d 478, affirmed per curiam 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Rogers v. United States Lines, 3 Cir., 1953, 205 F.2d 57, reversed per curiam 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Casbon v. Stockard Steamship Corp., D. C.La.1959, 173 F.Supp. 845, 848.

■■ Respondents place their principal reliance on Brabazon v. Belships Co., Ltd., 3 Cir., 1953, 202 F.2d 904. The facts in that case are distinguishable from those here involved. In Belships certain locomotives had been stowed in rows in the lower part of the hold. There was a gap of some three or four feet between the roofs of the cabs of two locomotives standing side by side. Bridging this gap were two boards. The libelant in that case walked on these boards. One board broke under his weight and he fell and sustained injuries. The board was not placed between the cabs by any member of the stevedore gang, of which libelant was a member, and it was not a piece of lumber which had been supplied by Belships. The securing of the cargo and the activities in the hold were being accomplished under contract with Belships by *two* independent contractors. It was conceded that the plank was too thin to bear the weight of a human being. Proper lumber was supplied for staging and there was no evidence as to why the thin boards were used. There was no evidence as to who had put the defective planks in place. The area involved was not in general use by personnel. The court points out that it was not dealing with scaffolding or any specialized structure, the existence or location of which should have been expected. This is a far different factual situation than the one with which we are concerned. The defective planks in Belships were not designed to become part of the ship's equipment or appurtenances as they were in the instant case. The court held that there was liability on the theory of negligence but not on unseaworthiness. Since the court held that there was liability on the one feature, its statement with reference

to unseaworthiness should be viewed as dictum. It could well be argued that the court's statements on unseaworthiness are in direct conflict with the authorities I have previously cited. In any event, the case does not control the decision in this case. The duty of the owner to furnish a seaworthy ship is absolute. Neither party questions that the board which collapsed was defective. I find that the defective lumber being used to cover the deep tank opening became part of and appurtenant to the vessel and made the vessel unseaworthy. No negligence has been shown.

■■ II. Respondents urge that the work being done by libelant was work which was not traditionally done by a seaman and that the condition created in covering the deep tank was a transitory one. The owners' duty to furnish a seaworthy ship is absolute. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Rogers v. United States Lines, supra; Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. That the unseaworthiness may be caused by defective equipment temporarily used on board a vessel by an independent contractor over whom the owner has no control is of no significance. The shipowners' actual or constructive knowledge of the unseaworthy condition is not essential to liability. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941.

The lumber was placed over the opening of the deep tank in preparation for the lining of the ship. The ship was being lined in order to accommodate a cargo of bulk grain. In other words, this work was being done for the purpose of properly loading the ship. The evidence is to the effect that it is now customary for the longshoremen to line the ship and do the type of work involved. However, we are not concerned with present customs or work rules, but with the ancient and historical duties of seamen. In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95, 96, 66 S.Ct. 872, 877, 90 L.Ed. 1099:

"All the considerations which gave birth to the liability and have shaped its absolute character dictate that the owner should not be free to nullify it by parcelling out his operations to intermediary employers whose sole business is to take over portions of the ship's work or by other devices which would strip the men performing its service of their historic protection. * * * Moreover, his ability to distribute the loss over the industry is not lessened by the fact that the men who do the work are employed and furnished by another. *Historically the work of loading* and unloading is the work of the ship's service, performed until recent times by members of the crew. (citing cases) That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection." (Emphasis added.)

■ Preparing a ship to receive cargo requiring special provisions for its storage is in fact rendering services necessary in the performance of the ship's business of carrying cargo and a person engaged in such work is covered by the doctrine of unseaworthiness. To a worker performing such historic duties is owed the non-delegable duty to provide a reasonably safe place to work, as well as reasonably safe appliances with which to perform the work. This duty cannot be contracted away by requiring the shoreside contractor to supply the men and equipment. Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798. This contention is without merit.

■ III. Under this contention respondents claim that libelant was a vice-principal and that his negligence was the sole cause of his injuries. Respondents argue that libelant was in complete charge of the safety of his gang and as such was a vice-principal within the

meaning of Galer v. Weyerhaeuser Timber Co., 218 Or. 152, 344 P.2d 544, and Howard v. Foster & Kleiser Co., 217 Or. 516, 332 P.2d 621, 342 P.2d 780, and that since, on this operation, he was in complete charge, he should not be permitted to recover. It is conceded that libelant was the gang boss in charge of the gang working in the particular hold. Under the provisions of the Pacific Coast Marine Safety Code and under the testimony in this case, the primary duty to see that the work was safe was placed upon the hatch tender, rather than the gang boss, such as libelant. The testimony is that the hatch tender was actually the safety man for the gang. Libelant, as gang boss, was probably under a duty to exercise greater care in a dangerous situation than would be required of another member of the gang. However, he cannot be treated as a vice-principal nor as the master of the vessel, as was the case in Walker v. Lykes Bros. S. S. Co., 2 Cir., 1952, 193 F.2d 772. The vessel is liable to the longshoreman for unseaworthiness, even though the unfitness of the vessel may arise, in part, from his own misconduct. Grillea v. United States, 2 Cir., 1956, 232 F.2d 919.

■ I cannot consider this subject without touching on contributory negligence. If the negligence of the libelant were the sole proximate cause of the injuries sustained, it is arguable that there should be no recovery, irrespective of the broad language used by Justice Hand in Grillea. However, that problem is not here involved. The defective lumber was actually furnished by the company and libelant had nothing to do with its procurement. Nevertheless, libelant was under a duty to exercise that care which would be exercised by an ordinary, prudent person under like circumstances and conditions. The record is clear that the lumber in question was knotty. The evidence, including the photographs, shows that libelant was in an extremely dangerous position in standing on this defective lumber. The fact that the lumber was knotty should have been a warning to libelant that it should be tested before risking injury to personnel. This grade of lumber was uniformly furnished for lining the ship, but there is no evidence that this type of knotty lumber was ordinarily furnished to be put to this particular use. Libelant must have known that if one of the boards broke, he would be catapulted into the hold. By his own testimony he knew that the boards were knotty. The evidence would indicate that any reasonable inspection or reasonable lookout would have discovered the defect or prevented the accident. The finding must be that the libelant was negligent.

■ We now approach the amount of damages to be allowed libelant. The injuries consisted of severe lacerations of the elbow which affected the use of the right wrist and hand for some time. These injuries have completely healed. He sustained a moderately severe injury to the hip which caused muscle spasm drawing the spine to the right. This ill-posture of the spine evidently causes the plaintiff to limp and it seems to be somewhat permanent in nature. Libelant's doctor testified that libelant would not be able to do heavy work, although he would be able to work as a gang boss, the type of work he was doing at the time of the accident. Dr. Jones testified that the injury was not permanent. I find that libelant sustained a moderate permanent injury.

The record indicates that libelant lost wages for a period of approximately two and one-half months and that he was earning approximately $600 per month. An allowance of $1,500 for lost wages would be sufficient. Doctor, hospital and medical expenses in the sum of $534.50 are allowed. I find that $12,500 is a proper amount to be allowed as general damages. Libelant was guilty of substantial contributory negligence equalling 30% of the total fault. The amounts of the above awards are reduced by such percentage and judgment will be awarded to libelant for the sum of $10,174.15.

· This opinion shall stand as the findings and conclusions. An appropriate decree shall be drafted, served and presented.