325 F.2d 129
 Virgil Hayden CRASS, Libelant,
v.
The M/V MANITOU, her engines, boilers, etc., and Aiple
Towing Company, Respondents, and v. CENTRAL SOYA
COMPANY, Inc., Third-Party Respondent.
Frank E. AIPLE, doing business as Aiple Towing Company, Appellant,
v.
CENTRAL SOYA COMPANY, Inc., Appellee.
 No. 14198.
 United States Court of Appeals Seventh Circuit.
 Dec. 4, 1963.
 
 Charles M. Rush, John M. O'Connor, Jr., of Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for Frank E. Aiple, doing business as Aiple Towing Co., appellant.
 Stuart B. Bradley, Joseph V. McGovern, of Bradley, Pipin, Vetter & Eaton, Chicago, Ill., for Central Soya Co., appellee.
 Before DUFFY, KNOCH and CASTLE, Circuit Judges.
 CASTLE, Circuit Judge.
 
 
 1
 Virgil Hayden Crass, the libelant, brought suit against the towboat Manitou and his employer, Aiple Towing Company,[1] respondents, for personal injuries suffered while libelant was working as a crew member of the towboat. Crass fell through an open hatch into the hold of an empty grain barge which was being towed under a contract between Aiple and the barge owner, Central Soya Company, Inc.[2] Crass alleged that his injuries were caused by the negligence of Aiple and the unseaworthiness of the Manitou and the barge. Aiple, by petition under Admiralty Rule 56, brought Central Soya Company, Inc. into the suit, alleging that if Aiple is held liable to Crass then Central Soya is liable over to Aiple by virtue of the written contract of towage.
 
 
 2
 The District Court, following a trial without a jury, made and filed findings of fact and conclusions of law, and entered judgment against Aiple in favor of Crass for $60,000. The judgment order also found that Crass was not entitled to judgment against Central Soya and that Aiple was not entitled to recover against Central Soya. Aiple satisfied the money judgment and appealed from those parts of the judgment which ordered that Crass was not entitled to judgment against Central Soya and Aiple was not entitled to recover over against Central Soya, appellee.
 
 
 3
 Aiple contends the District Court erred in failing to enforce in favor of Aiple and Crass and against Central Soya, the barge owner, the specific warranty and indemnity provisions of the towage contract between Aiple and Central Soya. Those warranty and indemnity provisions are as follows: Central Soya
 
 
 4
 '* * * warrants the tow to be seaworthy and properly equipped and supplied, and in all other respects fit and suitable to be towed, and AIPLE TOWING COMPANY shall not be obligated to inspect any tow and/or the stowage of any cargo therein or thereon, but such inspection if made, shall not affect the warranties of Owner (Central Soya) as herein expressed. * * *'
 
 
 5
 '* * * Owner (Central Soya) agrees to indemnify AIPLE TOWING COMPANY and any towing craft and the owners, charterers, operators and/or underwriters of such craft and hold such parties and craft harmless against all claims for any loss of or damage to or expense incurred in connection with the tow and/or its cargo, including without limitation, claims for recoupment or by way of liability over in mutual fault collision cases wherein the towing craft will be involved, and from any liability to or on account of the crew or personnel, or any loss of or damage to personal effects of said crew or personnel, howsoever arising; provided, however, that nothing herein contained shall be construed as rendering owner or the tow and/or its cargo, if any, liable for any loss of, damage to, or expense in connection with the property of AIPLE TOWING COMPANY or any third party or for loss of life or personal injury for which Owner (Central Soya) or the tow, and/or its cargo, if any, would not otherwise be liable.'
 
 
 6
 The record discloses that Aiple's tug or towboat, the Manitou, operated on the Mississippi River. In the early, dark hours of the morning of February 21, 1961, barge AD 160, owned by Central Soya, was picked up by the Manitou with other barges for the purpose of towing it from St. Louis to Louisiana, Missouri. The tow, with the Manitou pushing, consisted of three Aiple barges. Barge AD 160, with another barge abreast, was at the head of the tow-- being pushed upstream.
 
 
 7
 The cargo box of the AD 160 was 196 feet long, 37 1/2 feet wide and 11 feet deep, not including the height of the top. The top or roof was shaped in an inverted 'V' at about a 45 degree angle, sloping up from the edges. Along each side of the top were openings covered by six sets of doors or hatch covers. Each set covered an opening. The doors or covers were hinged at the side. They were on an incline from the deck, running from three feet to six feet at the highest point. Running the length of each side of the barge was a gunwale or walkway.
 
 
 8
 Running lights at the head of the tow were required for night travel. Such lights had been strung across the bows of the two barges. The lights received their current from the Manitou through wires running the length of the barges and joined by electrical plug connections between the barges, and between the Manitou and the barge immediately in front of it. To drop off a head barge, it is necessary to remove the running lights and the wire running the length of that barge.
 
 
 9
 When the Manitou picked up barge AD 160 the stern, starboard hatch cover or door was missing. After the accident it was found lying in the bottom of the barge below the opening. Its hinges were broken. The absence of the cover or door left a four by eight foot opening. One of Aiple's mates had observed that the cover was missing. Crass and some of the other crew members had passed within two feet of the open hatch on numerous occasions during the two days the Manitou had been towing the barge. The barge itself was unmanned and there is no showing that Central Soya, its owner, had any knowledge of the missing hatch cover prior to the accident.
 
 
 10
 It was after midnight, on a dark, rainy night, when the tow approached Louisiana, Missouri, where barge AD 160 was to be dropped. Crass was ordered by the mate to remove the running lights. After unplugging the connection at the stern of AD 160, he commenced coiling the wire around his arm, 'crawled on top of the timberhead first and then went onto the top of the barge'. He started diagonally across the roof of the cargo box, coiling wire as he went. He had taken only a step or two when he stepped off into space where the hatch cover or door was missing and fell about sixteen feet into the hold, injuring himself.
 
 
 11
 The trial court fund that the injuries to Crass were caused by negligence of Aiple and contributory negligence of Crass, that barge AD 160 was seaworthy and that Central Soya was not negligent.
 
 
 12
 Aiple contends that (1) the delivery of the barge to it for towing with a missing hatch cover was a breach of Central Soya's contractual warranty that the barge was 'seaworthy and properly equipped and supplied, and in all other respects fit and suitable to be towed' and such breach rendered Central Soya liable to Aiple for the judgment Crass recovered from Aiple resulting from his fall through the open hatch. Further, that Crass should have been permitted to recover directly from Central Soya, because not only was the barge unseaworthy but, in addition, the above warranty ran to Crass as a third-party beneficiary; and (2) Central Soya is liable over to Aiple under the express indemnity provision of the contract.
 
 
 13
 The District Court specifically found, among other things, that it was not unusual for empty grain barges on the Mississippi to ride with hatch covers open or entirely removed; the purpose of hatch covers being to protect cargo from weather. It further found that Central Soya could not have reasonably anticipated the hatch covers would be used as work areas.
 
 
 14
 In reviewing the judgment of the trial court, sitting without a jury in Admiralty, we may not redetermine findings of fact unless we find them to be clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Bloomquist v. T. J. McCarthy Steamship Company, 7 Cir., 263 F.2d 590, 593. The findings here are supported by substantial evidence in the record. And we perceive no basis in the record for a finding or conclusion that the barge was not 'properly equipped and supplied, and in all other respects fit and suitable to be towed'. At the bow and stern there were work areas about eight feet in width and on each side of the barge there was a three foot gunwale or walkway running the full length of the barge. That it was the custom of Aiple's crew, known and approved by the master, to walk on and across hatch covers of barges to string or remove running lights does not make it either a proper practice or one foreseeable on the part of Central Soya-- albeit it made the task easier.
 
 
 15
 Seaworthiness and compliance with the warranty are to be determined by the standard of whether the barge and its appurtenances were 'reasonably fit for the purpose for which they are to be used'. Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 213, 83 S.Ct. 1185, 1190, 10 L.Ed.2d 297.
 
 
 16
 The hatch covers which are here involved were neither intended for use as work areas nor located in a work area. This distinguishes the case from Shenker v. United States, 2 Cir., 322 F.2d 622; United States v. Tug Manzanillo, 9 Cir., 310 F.2d 220 and Grillea v. United States, 2 Cir.,232 F.2d 919, relied upon by appellant. In Shenker a piece of dunnage had been left lying on a covered and battened down deck hatch of a naval vessel. A timekeeper for a stevedoring contractor boarded the vessel to ascertain when the stevedores who were working aboard the ship would quit work for the day. He walked forward along the starboard side of the main deck until he saw the stevedores' foreman walking along the portside. He called to the foreman who waved and beckoned to him. Both men mounted the hatch and met near its center. In leaving the hatch the timekeeper unexpectedly stubbed his toe against a plank which had been left lying on the hatch and fell to the deck, about forty inches below, and was injured. The district court specifically found that in walking on the hatch the foreman and timekeeper were giving it an intended use because they 'were following a customary practice' that was 'foreseeable as a likely one by the owner and was consonant with a shipboard procedure recognized as permissible.' In affirming a judgment awarding damages to the timekeeper the Second Circuit said: 'The holding that the (vessel) was unseaworthy, which in any event appellants do not appear to challenge, was therefore entirely proper'. The nature of the vessel, type and location of the hatch involved, as well as the factual finding of customary permissible practice and lack of challenge to the finding of unseaworthiness serve to distinguish Shenker from the instant case. Here an empty grain barge is involved-- a type of vessel shown by the record to be commonly towed with hatch covers opened or removed-- and there is substantial evidence supporting the District Court's findings that, despite the practice of Aiple's crewmen (which, however, was unknown to the barge's owner or to Central Soya) 'it was not (the hatch covers') purpose to be used as a work area' and Central Soya 'could not have reasonably anticipated the hatch covers would be used as work areas'. On the facts of this record those findings are not clearly erroneous-- in fact or in law. In Manzanillo the cover of a small hatch on the tug's deck had become unsecured and the master of the vessel being towed was injured when he stepped on the hatch cover and it capsized, dropping him into the hold. In Grillea the wrong hatch cover had been placed over the 'pad-eye' and it gave way when a longshoreman stepped on it. The cover had become part of the platform across which the workmen were to walk in order to place another cover in the prosecution of their work. Appellant's reliance on such cases is misplaced. The facts here make the rationale of Anderson v. Scully (D.C.S.D.N.Y., 1887),31 F. 161 and Adams v. The Barge UBL 118 (D.C.E.D.La., 1957), 154 F.Supp. 612 applicable. In Anderson the captain of a canal boat fell through an open hatch cover of a scow when he climbed up the roof-shaped sloping hatches to the opposite side where one hatch cover was not in place. The court pointed out (31 F. p. 162):
 
 
 17
 'The deck furnished a safe and easy passage in this case. It was the natural and proper passage. The roof formed by the hatch covers was not designed as a passage-way.'
 
 
 18
 And, in The UBL 118 it is said (154 F.Supp. pp. 613 and 614):
 
 
 19
 'Barge UBL 118 was a hopper barge equipped with a coaming varying from three to four feet in height which completely encircled a single hatch. Sliding hatch covers resting on the coaming rose to a low peak approximately one foot higher at the vessel's centerline. Between the coaming and the vessel's sides and ends there was an unobstructed walkway measuring between two and three feet on the port and starboard sides and seven feet at bow and stern. By accident two covers had been dropped overboard * * * leaving a large opening at the forward end of the hatch. The barge was light and hatch covers were not needed. 'Libelant (a crewman of the towboat who fell into the hold through the open hatch while placing lanterns) * * * was careless and negligent in climbing or walking on the covers or coaming, * * * the condition or seaworthiness of the barge or tug had no bearing on his accident. Both vessels were, however, entirely seaworthy for purposes of this voyage.'
 
 
 20
 The use of an appurtenance of a vessel for a purpose other than that for which it was intended cannot form the basis for a conclusion that the vessel is unseaworthy. There was no error in the District Court's conclusion that there was no unseaworthiness or breach of warranty upon which either Crass or Aiple could predicate a right to recovery from Central Soya.
 
 
 21
 The finding that Central Soya was not negligent is amply supported. And it defeats any recovery by Aiple under the indemnification provision of the towage contract. The provision by its express terms excludes indemnification for injury to any third party-- such as an employee of Aiple-- for which Central Soya 'would not otherwise be liable.'
 
 
 22
 The judgment order of the District Court is affirmed.
 
 
 23
 Affirmed.
 
 
 24
 DUFFY, Circuit Judge (dissenting).
 
 
 25
 It is my view that Central Soya's delivery of the barge with a missing hatch cover breached Central Soya's separate warranty that the barge was 'properly equipped and supplied and in all other respects fit and suitable to be towed.' This is something more and broader than a warranty of sea-worthiness.
 
 
 26
 The presence of comparatively narrow walkways along side of the barge with a missing hatch cover, did not make the barge 'properly equipped.' I think the evidence showed it was Aiple's accepted custom and practice for members of the crew to walk across the tops of barges to put out and take in running lights.
 
 
 27
 The large gaping hole caused by the missing hatch cover was a menace to the tugboat crew, and a breach of the express warranty that the barge was 'properly equipped and supplied and in all other respects fit and suitable to be towed.' The District Court judgment that Aiple could not recover from Central Soya was, in my view, clearly erroneous.
 
 
 
 [1]
 Frank E. Aiple doing business as Aiple Towing Company. Referred to herein as Aiple
 
 
 [2]
 Hereinafter referred to as Central Soya