Frank GRAYSON, Plaintiff-Appellant,

v.

CORDIAL SHIPPING CO., Defendant-Appellee.

and

CORDIAL SHIPPING CO., Third Party Plaintiff-Appellant,

v.

FEDERAL MARINE TERMINALS, INC., Third Party Defendant-Appellee.

Nos. 73–1534, 73–1557 and 73–1659.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1974.

Decided May 8, 1974.

Joseph V. McGovern, Michael A. Snyder, Chicago, Ill., for Cordial Shipping.

John W. Hough, Robert A. Creamer, Francis P. Smith, Martin J. Healy, Jr., Chicago, Ill., for Grayson, and Federal Marine Terminals.

Before KILEY, Senior Circuit Judge, SPRECHER, Circuit Judge, and JAMESON,* Senior District Judge.

JAMESON, Senior District Judge.

Frank Grayson, a longshoreman employed by Federal Marine Terminals, Inc. (Federal), a stevedore, brought suit against Cordial Shipping Co. (Cordial) for personal injuries sustained while working on a vessel owned by Cordial. In turn Cordial brought a third-party action against Federal seeking indemnity for fees and expenses, claiming a breach of the stevedore's warranty of workmanlike service. Following a non-jury trial the district court entered findings of fact and conclusions of law denying recovery to Grayson on his personal injury claim against Cordial and also denying recovery to Cordial on its indemnity claim against Federal. Grayson has appealed from that portion of the

* Senior District Judge William J. Jameson of the District of Montana is sitting by designation.

judgment denying him relief against Cordial, and Cordial has appealed from the portion of the judgment denying it relief against Federal.

### Statement of Facts

At about 1:00 P.M. on September 24, 1969, Federal, a stevedore and terminal operator, hired two gangs of longshoremen to discharge cargo from the No. 2 and 4 holds of one of Cordial's vessels, the M/V Konstantis Yemelos, which was docked at Federal's terminal in the Port of Chicago.

Grayson, one of the longshoremen hired, was assigned with eight other men to work on the 'tween deck of the No. 2 hold.[1] His longshore gang was led aboard the vessel by Federal's ship foreman, Jerry Ross, who directed them to a small deckhouse at the port side of the forward end of the vessel.

Inside the deckhouse, which is six to seven feet wide, there are two identical, unmarked manholes three to four feet apart. These manholes provide access to the 'tween decks of the No. 1 and 2 holds, which, though adjacent, are separated internally by a watertight steel bulkhead. When entering the deckhouse through its single entrace door the manhole for the No. 1 hold is on the left and that for the No. 2 hold is on the right.

The manholes were fitted with metal covers, and the district court found that both covers were closed at the time Grayson and his work crew boarded the vessel. Ross opened the manhole leading to the No. 2 'tween deck. The court found further that "The main deck hatch cover over the vessel's No. 2 hold was open the entire afternoon, permitting daylight into the No. 2 'tween deck area." The "No. 1 main deck hatch cover was completely closed at the time [Grayson] began working".

After the gang entered the No. 2 hold it was discovered that the cargo was damaged. Work was delayed while a marine surveyor was called. William Woods, a union steward, also came aboard the vessel to inspect the cargo. Woods testified that when he entered the deckhouse the covers on both manholes were open. He descended the ladder to the 'tween deck of the No. 1 hold, but upon reaching the deck he "noticed it was pitch black" and realized that he was in the wrong hold. He climbed the ladder and entered the No. 2 hold.

While Woods was on the No. 2 'tween deck Grayson left the hold to go to washroom facilities ashore. At trial Grayson could only remember proceeding 20 to 40 feet from the deckhouse. He was unable to recall whether he actually went to the washroom, and his next recollection was returning to the deckhouse to resume work.

For reasons unknown Grayson entered the No. 1 manhole. He did not look into the manhole before entering it and, though not his usual custom, he stepped into the manhole without looking "where [his] feet were going". Grayson took "several steps down through the manhole", and the next thing he remembers he was "yelling for help".[2]

Robert Leonard, a longshoreman working with Grayson, left the No. 2 hold about 25 minutes after Grayson. He testified that as he was coming out of the No. 2 manhole he heard Grayson yelling for help from the No. 1 hold. Leonard entered the No. 1 hold to attempt to locate Grayson, but after descending half-way down the ladder to the 'tween deck he returned to the sur-

---

1. Grayson testified that when he was hired by Federal's ship foreman, Jerry Ross, he was told he would be working in the No. 1 hold. Ross denied this and testified that Grayson was assigned to the No. 2 hold. It was stipulated that no work was being conducted in the No. 1 hold. Grayson's witness, Robert Leonard, a longshoreman hired to work with Grayson, corroborated Ross, and

Grayson's testimony on this point was impeached by his prior deposition, in which he testified that he "was employed to work in hold No. 2, in 'tween deck".

2. An orthopedic surgeon testified that Grayson's memory lapses were due to retrograde amnesia resulting from the shock of the injuries sustained in the No. 1 hold.

face on account of the darkness. He located a flashlight and entered the No. 1 hold, but even with the flashlight he was unable to see clearly and so again returned to the surface and summoned aid.

Shortly thereafter, at approximately 3:00 P.M., the main deck hatch to the No. 1 hold was opened, and Grayson was found lying on the deck of the lower hold, which is 22 to 23 feet below the No. 1 'tween deck.[3] A ladder connects the 'tween deck and lower hold, but the 'tween deck also has a large hatch opening in its floor, located approximately eight to 12 feet from the base of the 16 foot ladder leading to the manhole. The distance from the 'tween deck to the deckhouse floor is approximately 12 feet.

No one, including Grayson, knows how he came to be in the lower hold.[4] Ross testified that in his opinion a man could not have fallen or jumped directly from the manhole ladder through the 'tween deck hatch and into the lower hold. Woods, who entered the No. 1 'tween deck shortly after Grayson was discovered, testified that there was dunnage and debris scattered about the 'tween deck near the base of the manhole ladder, that the 'tween deck hatch was open, and that there were no guardrails or safety nets around the hatch opening. Woods' testimony was corroborated by several photographs of the 'tween deck area taken the day after Grayson's accident and introduced on his behalf at trial.

The district court found that "When the main deck hatch cover over the No. 1 hold is in a closed position, as it was before [Grayson] was found in the No. 1 lower hold, a person looking into the manhole leading to the No. 1 'tween deck would observe total darkness. On the afternoon in question, the No. 2 main deck hatch cover was completely open, and a person looking into the manhole

leading to the No. 2 'tween deck would observe daylight and could see the bottom of the ladder, the cargo stowed in the 'tween deck, and the deck itself."

At the trial Grayson and Charles Benifield, another longshoreman, testified that manholes leading to holds that are not being loaded or unloaded are customarily closed. However, Ross O'Connor and Dossie Bond, a Federal ship foreman, testified that there is no custom that dictates when manholes are to be opened or closed, and that manholes are at times left open "in places where they are not being worked". On the basis of this conflicting testimony the district court found that "There was no custom or practice in use among longshoremen or stevedores in the Port of Chicago in September 1969 with respect to scuttles or manholes leading to or providing access to holds where no longshoremen were at work and where no longshoremen were assigned to work."

### Conclusions of District Court

The court recognized that Grayson's right of recovery depended upon a showing that his injuries were proximately caused by Cordial's negligence or the unseaworthiness of Cordial's vessel. The court concluded, and Grayson conceded, that no negligence had been established on the part of Cordial.

With respect to the claim of unseaworthiness, the district court held that the duty of the shipowner to provide longshoremen "with a seaworthy or reasonably safe place to work is confined to those areas of the vessel where longshoremen may reasonably be expected to go in the course of their duties". The court concluded that Cordial "had no reason to expect" that Grayson would enter the No. 1 hold, and that Cordial therefore "had no duty to make that space seaworthy for [his] benefit". In

---

3. Grayson's injuries included fractures of the left wrist, left elbow, left femur and several pelvic bones.

4. Michael O'Connor, Federal's operations manager, testified that he spoke with Grayson just after he had been removed from the No. 1 hold. O'Connor asked Grayson "what happened", and Grayson replied "I don't know."

addition the court found that "there is no evidence that any unseaworthy condition proximately caused or contributed to cause [Grayson's] injury."

With respect to Cordial's claim against Federal, the district court concluded that "No evidence was presented" that the stevedore, Federal, "breached its implied warranty of workmanlike service", and that in the absence of such evidence the shipowner, Cordial, was "not entitled to recover indemnity".[5]

### Contentions on Appeal

Grayson contends that (1) Cordial owed him a duty of maintaining the No. 1 hold in a seaworthy condition, (2) the conditions in the No. 1 hold at the time of his accident were unseaworthy, and (3) the unseaworthy conditions were a proximate cause of his accident. Cordial argues that (1) Grayson was contributorily negligent as a matter of law and this was the sole cause of his accident, (2) Grayson's negligence is imputable to his employer, with the legal effect that his negligence constitutes a breach by Federal of its implied warranty of workmanlike service, and (3) Federal's breach of its implied warranty entitles Cordial to indemnity for the expenses incurred in defending Grayson's claim.

### Grayson's Appeal

As noted *supra*, the district court denied recovery to Grayson primarily on the ground that Cordial had no duty to maintain the No. 1 hold in a seaworthy condition since it had no reason to foresee that Grayson would enter the No. 1 hold. Grayson argues that the concept of foreseeability employed by the district court is not a defense in an action based upon unseaworthiness, and that in any event it was foreseeable that he might enter the No. 1 hold.

█ We agree with the district court that the duty of a shipowner to provide a longshoreman "with a seaworthy or reasonably safe place to work is confined to those areas of the vessel where longshoremen may reasonably be expected to go in the course of their duties". See Calderola v. Cunard Steamship Company, 279 F.2d 475, 477 (2 Cir. 1960), cert. denied, 364 U.S. 884, 81 S.Ct. 172, 5 L.Ed.2d 104 (1960), and Barnes v. Rederi A/B Fredrika, 350 F.2d 865, 867 (4 Cir. 1965), cert. denied, 383 U.S. 910, 86 S.Ct. 895, 15 L.Ed.2d 665 (1966). This court in Crass v. M/V Manitou, 325 F. 2d 129, 132 (1963), cert. denied, 376 U. S. 970, 84 S.Ct. 1137, 12 L.Ed.2d 85 (1964), affirmed a judgment denying recovery against a barge owner for injuries sustained by a crew member who fell through an open hatch, where the district court found that the barge owner "could not have reasonably anticipated the hatch covers would be used as work areas".

█ It is true, as Grayson contends, that the Supreme Court has said that a shipowner's duty to provide a seaworthy vessel and a reasonably safe place to work is not "limited by conceptions of negligence". Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549, 80 S. Ct. 926, 932, 4 L.Ed.2d 941 (1960).[6]

---

5. The court also denied recovery for fees and expenses incurred by Cordial "in the absence of evidence as to the amount of such expenses". Cordial states in its opening brief on appeal that this "resulted from a misunderstanding between counsel" and that the problem has been cured by a stipulation that Cordial "incurred reasonable expenses and attorneys' fees of $7,726.60 in the defense of Grayson's claim against the ship". Cordial contends that "This case should be remanded to the District Court with instructions to enter judgment in favor of [Cordial] and against [Federal] in the stipulated sum of

$7,726.60 in addition to the amount of expenses and fees found by the District Court as having been reasonably incurred in the defense of Grayson's appeal."

6. See also Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), where the Court held that "the shipowner's obligation of seaworthiness extends to longshoremen injured while doing the ship's work aboard but employed by an independent stevedoring contractor whom the owner has hired to load or unload the ship." *Id.* at 89.

This does not mean, however, that the concept of foreseeability is irrelevant in defining the extent of a shipowner's duty to provide a seaworthy vessel for longshoremen. It is simply an expression of the well settled rule that the shipowner's duty is "absolute and completely independent of his duty under the Jones Act to exercise reasonable care". *Mitchell, supra* at 549.[7] We agree with the statement in *Barnes, supra* at 866–867,[8] that:

"No mistake is perceived in the Court's submission of the issue of unseaworthiness. Confining the duty of maintaining a seaworthy vessel to the reasonable scope of the longshoreman's activity is logical and correct in principle. Fully acknowledged as an obligee of the ship's duty, nevertheless the longshoreman's due should not exceed the need for his protection as measured by his function on the vessel. He is not subject to momentary orders, as is a crewman, to any part of the vessel whatsoever, and his presence at a location unconnected with his task is not to be anticipated."

■ Grayson alternatively argues that it was foreseeable that he might enter the No. 1 hold. Although the district court set forth its contrary holding as a "conclusion of law", our opinion in *Crass, supra* at 132, makes it clear that such a determination is a finding of fact which may not be set aside unless clearly erroneous. See McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L. Ed. 20 (1954).

Grayson's contention that it was foreseeable that he might enter the No. 1 hold finds support in the proximity of the two manholes, the fact that they are identical in appearance, and Woods' mistaken entry of the No. 1 hold. On the other hand, Grayson, unlike Woods, had been led to the No. 2 manhole by Federal's ship foreman, was instructed that his work was to be performed in the No. 2 hold, and had in fact been in that hold.

It is stipulated that no one was assigned to work in the No. 1 hold. Because its deck hatch was closed, one who looked into the manhole would encounter almost total darkness. The deck hatch of the No. 2 hold had been removed and the hold was well lighted—a fact apparent to anyone who looked into the No. 2 manhole. When entering the deckhouse through its single doorway, the No. 2 manhole is on the right and the No. 1 manhole is on the left.

■ Although conflicting inferences may be drawn from the testimony, there is substantial evidence to support the finding of the district court that Cordial had no reason to expect that Grayson would go into the No. 1 'tween deck. We cannot say that this finding of the district court is clearly erroneous.

### Cordial's Appeal

Seeking indemnity "for expenses and attorney fees incurred in the defense of Grayson's claim and in opposing his appeal", Cordial argues that Grayson was contributorily negligent as a matter of law and that his negligence is imputable to Federal and constitutes a breach of Federal's implied warranty of workmanlike service.

---

7. As the Fifth Circuit aptly stated in Marshall v. Ove Skou Rederi A/S, 378 F.2d 193, 197 (1967), cert. denied, 389 U.S. 828, 88 S.Ct. 86, 19 L.Ed.2d 84 (1967) : "Articulating criteria to determine seaworthiness requires use of the language of negligence." See also the discussion in *Marshall* at 197, n. 6.

8. *Barnes* was similar factually to this case. Barnes was a longshoreman, and his gang had been ordered to reload some cargo upon the 'tween deck, just forward of the No. 4 hold. He was found lying at the foot of a ladder in the lower part of the No. 5 hold approximately 40 feet from where his gang had been working. His work did not require access to or use of the No. 5 hold, which was dark and unlighted. It was contended that the absence of hatch boards constituted unseaworthiness as a matter of law. The court held that this was a factual issue, as were the questions of whether this caused his fall and "within what space longshoreman Barnes was warranted seaworthiness".

716

It is well settled that every stevedoring contract contains an implied warranty to the shipowner that the stevedoring operations will be performed in a safe and workmanlike manner. See Ryan Co. v. Pan-Atlantic Corp., 350 U.S. 124, 133–135, 76 S.Ct. 232, 100 L.Ed. 133 (1956) and Bagrowski v. American Export Isbrandtsen Lines, Inc., 440 F.2d 502, 504–505 (7 Cir. 1971). "The stevedore company's duty under its warranty includes the duty to provide longshoremen who will exercise reasonable care for their own safety * * *. Failure of a longshoreman to safely perform his duties constitutes a breach of the stevedore's warranty rendering the stevedore company liable for all harm to the shipowner resulting from the breach." Arista Cia. DeVapores, S. A. v. Howard Terminal, 372 F.2d 152, 154 (9 Cir. 1967).[9] The damages recoverable by the shipowner include attorneys' fees and reasonable disbursements connected with the defense of a longshoreman's action against the shipowner. See DeGioia v. United States Lines Company, 304 F.2d 421, 426 (2 Cir. 1962).

The Second, Fourth, and Ninth Circuits have held that the longshoreman's negligence constitutes a breach of the stevedore's warranty as a matter of law.[10] The Third and Fifth Circuits have held that the longshoreman's negligence is only "a factor to be taken into consideration on the issue of breach of the * * * [stevedore's] implied warranty."[11] It is unnecessary to decide which of these rules should be followed in this circuit.[12]

The crucial question for determination is whether it was established that Grayson was guilty of contributory negligence and that his negligence was the sole proximate cause of his accident. The district court concluded that "No evidence was presented that [Federal] * * * breached its implied warranty of workmanlike service." Although it is true, as Cordial contends, that the court did not explicitly find an absence of contributory negligence on the part of Grayson, we think that such a finding is implicit in the court's ultimate conclusion that there was no evidence of a breach of warranty by Federal.[13] More-

9. These rules apply even where, as here, "the shipowner is exonerated from fault or unseaworthiness". Guarracino v. Luckenbach Steamship Company, 333 F.2d 646, 648 (2 Cir. 1964), cert. denied, 379 U.S. 946, 85 S.Ct. 439, 13 L.Ed.2d 543 (1964).

10. See McLaughlin v. Trelleborgs Angfartygs A/B, 408 F.2d 1334, 1336 (2 Cir. 1969), cert. denied, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 464 (1969); Chinese Maritime Trust, Ltd. v. Carolina Shipping Co., 456 F.2d 192, 193 (4 Cir. 1972); and Arista Cia. DeVapores, S.A. v. Howard Terminal, supra.

11. Shaw v. Lauritzen, 428 F.2d 247, 250 (3 Cir. 1970) and Julian v. Mitsui O.S.K. Lines, Ltd., 479 F.2d 432, 433 (5 Cir. 1973).

12. Moreover, as pointed out in Julian, supra at 434, such a decision would, in any event, be of limited effect, since "Congress has removed the underlying basis for the decisions." The 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., provide that a longshoreman's personal injury action against a shipowner is limited to claims based upon negligence and that the "liability of the vessel * * * shall not be based

upon the warranty of seaworthiness or a breach thereof". 33 U.S.C. § 905(b). As the court observed in Julian, "The effect of limiting the shipowner's liability to his own negligence is to obviate the need for indemnity from the stevedore. Consequently the amendments [in § 905(b)] provide that the stevedore employer shall not be held liable to a shipowner for damages paid by the shipowner to longshoremen and any warranties to the contrary shall be void." The amendments became effective in November, 1972. The claims sued upon in this case are based upon events which occurred on September 24, 1969.

13. Cordial states in its reply brief that "The trial court was urged in the shipowner's proposed Findings of Fact and Conclusions of Law to find Grayson negligent, to impute Grayson's negligence to the stevedore in accordance with the law, and to enter judgment in favor of the shipowner against the stevedore for its attorney fees and expenses." Moreover, Cordial does not seek a remand for more specific findings with respect to contributory negligence, but simply requests that this court "review this issue with reference to the evidence on record".

over, as will be discussed *infra,* the district court's conclusion is supported by its finding that Grayson "does not know how he came to be in the No. 1 lower hold".

█ It is well settled in this circuit that a district court's findings with respect to negligence or the lack thereof are to be tested by the "clearly erroneous" standard. See Leatherman v. Gateway Transportation Co., 331 F.2d 241, 244 (7 Cir. 1964).[14] Cordial contends that the conclusion of the district court that no evidence was presented that Federal breached its implied warranty of workmanlike service is "clearly erroneous" and that Grayson's negligence and Federal's breach of its warranty of workmanlike service were established as a matter of law. We do not agree.

█ Contributory negligence becomes a question of law only "when it can be said that all reasonable minds would reach the conclusion, under the particular factual situation, that the facts did not establish due care and caution on the part of the person charged therewith". Albers v. Continental Grain Company, 220 F.2d 847, 849 (7 Cir. 1955). Judged by this standard, we cannot say that the evidence established as a matter of law that Grayson was negligent and that his negligence was the sole cause of the accident.

While the district court did not make any explicit findings with respect to Grayson's negligence, it is clear from the record that this issue was presented to the court. A post-trial memorandum filed by Cordial recites the filing of a memorandum by Federal "wherein it states that the shipowner presented no evidence that the stevedore breached its warranty of workmanlike service". Cordial then referred to the evidence from which it contended that the "contributory negligence of Grayson was established beyond doubt" and that "taking all the evidence * * * as a whole, it was manifest that the injury to Grayson was solely the result of his own negligence".

█ Cordial first argues that the mere fact that Grayson entered the No. 1 manhole without looking constitutes contributory negligence since the testimony was uncontradicted that "one looking down the manhole leading to No. 1 would have observed nothing but darkness; while one looking down the manhole leading to No. 2 would have seen daylight, the 'tween deck, and the activity there". It is true that the trial court could properly have drawn an inference of contributory negligence from this evidence. On the other hand, as noted *supra,* the No. 1 and 2 manholes were close together, identical in appearance and unmarked. We cannot say, under all the evidence, that Grayson's failure to look into the manhole before entering it was so unreasonable as to constitute contributory negligence as a matter of law.[15]

Cordial next contends that the evidence established that Grayson took "intentional affirmative action to leave [the] ladder and proceed in total darkness toward the open hatch" on the 'tween deck and, presumably, that he fell through the open hatch to the lower hold. However, as the district court rec-

14. Cordial relies upon the minority view of three other circuits. See Wright & Miller, Federal Practice and Procedure: Civil § 2590, where it is stated that: "Eight of eleven circuits follow the view that findings of negligence cannot be disturbed unless 'clearly erroneous' while the position is not wholly clearcut in the three circuits that seem to take a contrary position. The only Supreme Court decision in point supports the view of the great majority of the circuits. So does sound policy."

15. Cordial relies upon cases where the plaintiff had failed to use reasonable care to dis-cover the condition or instrumentality which obviously caused the harm. See *e. g.,* Kwarta v. United States Lines, Inc., 314 F.Supp. 112, 114 (D.Md.1970), vacated, 444 F.2d 26 (4 Cir. 1971), where the plaintiff was injured when he tripped over coiled heaving line which he would have observed had he been looking where he was going; and Merrill v. The S.S. Cuaco, 189 F.Supp. 321, 325 (D.Ore.1960), where boards on which a longshoreman had been walking collapsed, and the trial court found that any reasonable lookout would have disclosed defective lumber.

ognized in its findings, no one, including Grayson, knows "how he came to be in the No. 1 lower hold".

It is true, as Cordial argues, that Ross testified that in his opinion one could not fall or jump directly from the manhole ladder through the open 'tween deck hatch "due to the [approximately] 10' horizontal distance from the ladder to the closest point of the hatch opening". This, however, does not establish that Grayson "left the ladder and proceeded in total darkness toward the open hatch". It is conceivable that Grayson fell from the ladder before discovering that he was in the wrong hold, stumbled upon the dunnage and debris scattered about at its base, and, before regaining his balance, fell through the open hold.

There is substantial evidence to support the findings of the district court that Grayson himself did not know how he came to be in the No. 1 lower hold and that he "completely lost his memory as he started down the ladder". In the absence of clear evidence to support Cordial's theory of how the accident occurred, it cannot be said that the findings of the district court are clearly erroneous and that Grayson was contributorily negligent as a matter of law.

Affirmed.