**ALLEGHENY AIRLINES, INC., and G.E.C.C. Leasing Corporation, Plaintiffs-Appellants,**

v.

**UNITED STATES of America et al., Defendants-Appellees.**

No. 73-1273.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1974.

Decided Sept. 16, 1974.

Rehearing and Rehearing En Banc Denied Nov. 26, 1974.

Walter E. Rutherford, New York City, and Emerson Boyd, Indianapolis, Ind. (Robert L. Alpert, Robert B. Haserot, New York City, and William V. Hutchens, Indianapolis, Ind., on the brief), for Allegheny Airlines, Inc., and GECC Leasing Corp.

R. Stanley Lawton and Arthur P. Kalleres, Indianapolis, Ind., for Brookside Corp.

James E. Rocap, Jr., and Thomas P. Ledgerwood, Indianapolis, Ind., for Forth Corp.

Floyd W. Burns and Richard R. McDowell, Indianapolis, Ind., for Lee LeMay, Administrator.

Irving Jaffe, Acting Asst. Atty. Gen., Washington, D. C., Stanley B. Miller, U. S. Atty., Indianapolis, Ind., Morton Hollander and Michael H. Stein, Washington, D. C., for the United States.

Before SWYGERT, Chief Judge, KILEY, Senior Circuit Judge,[1] and HOFFMAN, Senior District Judge.[2]

SWYGERT, Chief Judge.

Plaintiffs, Allegheny Airlines, Inc. (Allegheny) and GECC Leasing Corp. (GECC) appeal from final judgments entered in favor of defendants, Brookside Corporation (Brookside), Forth Corporation (Forth is a wholly-owned subsidiary of Brookside), the United States, and the estate of Robert W. Carey. As a result of a mid-air collision on September 9, 1969 near Fairland, Indiana between an Allegheny aircraft en route to Indianapolis and a Piper Cherokee aircraft owned by Forth and operated by Carey who was a student pilot, plaintiffs brought suit to recover $3,750,000 for the destruction of Alle-

---

1. Judge Kiley approved this opinion before he died on September 6, 1974.

2. Honorable Julius J. Hoffman of the United States District Court for the Northern District of Illinois is sitting by designation.

gheny's DC–9–31 aircraft and to recover $250,000 for a turbojet engine mounted thereon which was owned by GECC.

Pursuant to the Federal Tort Claims Act plaintiffs' claims against the United States were tried to the court while, simultaneously, the plaintiffs' claims against the other defendants were tried to the jury. At the conclusion of plaintiffs' case the district judge entered the following orders which are the subject matter of this appeal: the court granted the Government's motion to dismiss under Rule 41(b) of the Federal Rules of Civil Procedure on the ground that Allegheny was contributorily negligent; on the basis of the court's determination that Allegheny was contributorily negligent, the court applied the doctrine of collateral estoppel to preclude Allegheny from continuing further against the defendants Forth and the estate of Carey; the trial judge granted a directed verdict in favor of Brookside; and dismissed GECC as a party plaintiff on the ground that it was not the real party in interest.

On appeal plaintiffs raise various issues, the most important of which are: (1) whether the district court's findings of fact and conclusions of law that Allegheny was contributorily negligent and thus barred from recovery are supported by substantial evidence and in accord with applicable law, and are not clearly erroneous; (2) whether the trial judge erred in dismissing GECC on the ground that it was not the real party in interest; (3) the propriety of the district court's grant of summary judgment to Forth and the estate of Carey on the ground that Allegheny was collaterally estopped; (4) whether the trial judge erred in entering a directed verdict in favor of Brookside. Plaintiffs also challenge as reversible error certain other rulings of the trial judge which they contend must be corrected in the event a new trial is granted. We reverse and remand for a new trial as to plaintiffs' claims against the United States, Forth, and the estate of Carey but affirm with respect to the defendant Brookside.

I

The mid-air collision between Allegheny's aircraft, Allegheny Airlines Flight 853 (Flight 853), and the Piper Cherokee aircraft operated by Robert W. Carey occurred at approximately 3:29 p.m. on September 9, 1969 in the airspace northwest of Fairland, Indiana. At the time of the collision Carey, as a student pilot, was engaging in a solo cross-country flight as part of his training for a private pilot's license. The airplane he was operating was owned by Forth Corporation which among other things operated Brookside Airpark and sold, rented, and serviced aircraft as well as provided ground and flight instruction to student pilots such as Carey. Carey had departed from Brookside Airpark, located northeast of Indianapolis, and was heading in a southernly direction, intending to fly to Bakalor Air Force Base located southeast of Indianapolis at Columbus, Indiana. Since Carey possessed only a student pilot's license all his flying was required to be performed in accordance with visual flight rules (VFR) requirements, the most important of which, for purposes of the instant action, was that Carey was prohibited from operating his aircraft closer than 500 feet from the base of any clouds. 14 C.F.R. § 91.105 (1968).

Allegheny Flight 853 departed from Cincinnati, Ohio en route to Indianapolis' Weir Cook Airport at 3:16 p.m. Flight 853 was under an instrument flight rules (IFR) clearance and consequently was operating under the jurisdiction of and in communication with the Indianapolis Air Traffic Control Center. Air traffic controller Masen Grant directed Flight 853 to proceed to Shelbyville, Indiana and then on to Indianapolis at an altitude of 10,000 feet mean sea level (MSL). At approximately 3:23 p.m. controller Grant advised Flight 853 that it was in radar contact and directed it to descend to 6,000 feet. Thereafter, since the aircraft was going to land at Indianapolis, controller Grant was required to termi-

nate his jurisdiction over Flight 853 and transfer air traffic control jurisdiction to the Indianapolis Approach Control facility, the Federal Aviation Agency facility that had jurisdiction for landings at Weir Cook Airport. Grant effected a radar handoff of Flight 853 to Merrill T. McCammack, the arrival radar approach controller at Weir Cook.

At 3:27 p.m. Flight 853 contacted controller McCammack and reported that it was in the process of descending to 6,000 feet. Approximately twelve seconds later, McCammack responded by requesting the aircraft to identify itself by use of its transponder to enhance its radar signal. McCammack then directed Flight 853 to fly a heading of 280 degrees and to descend to 2500 feet. Allegheny Flight 853 acknowledged these instructions at approximately 3:27.29 p.m.; this was the last known or recorded transmission of Flight 853.

Subsequent to Allegheny's 3:27.29 p.m. confirmation of instructions, McCammack allegedly watched the aircraft turn to 280 degrees on his radar, scanned his radar to determine if there was any other traffic in the area, and, observing none, he admittedly turned his attention from the radar screen to perform certain routine administrative functions which he described as follows:

"I was observing the target, checking the area in front of the aircraft and to either side to see if there were any aircraft that would be traffic for the flight that I was controlling. I observed no traffic for the aircraft, so then at approximately the time of twenty-nine I looked at the flight progress strip and noticed that I had not marked down the radar handoff time. I looked at the clock and it was approximately twenty-nine and I wrote this time down on the strip. I then coordinated with the departure con-

troller to see if there was any other traffic that he might have that would be a factor for the IFR separation of Allegheny 853, would be following anyone that they might be working that would be landing in Indianapolis ahead of flight 853. I also checked the weather sequence to make sure that the weather was still the same, checked the wind indicators to see what the wind was presently reading, and I also checked the altimeter to see that the information that the pilot had received was current. After doing these coordinating duties, I looked back to the radar scope and noticed that the target on Allegheny 853 was no longer visible."

While his attention was allegedly diverted, the mid-air collision occurred at 3:29.13 p.m. and the radar target return for Flight 853 disappeared within seconds thereafter.

McCammack did not observe the collision nor the disappearance of Flight 853 on his radar scope. Nor, did he at any time advise Flight 853 of the presence of the Piper Cherokee aircraft.

The collision occurred at an altitude of approximately 3600 feet MSL with the Piper Cherokee striking Flight 853 from the right at an angle of 106 degrees. Both aircraft crashed to the ground with the wreckage strewn over a site approximately twenty nautical miles southeast of Weir Cook Airport. There were no survivors of the collision.

## II

In assessing the propriety of the district court's findings as to Allegheny's asserted contributory negligence, we note that the proper standard for review of such findings is whether they are clearly erroneous and not supported by substantial evidence.[3] The findings

3. The district court entered judgment for the United States pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, which provides in relevant part:

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.

of the district court which led to its holding of contributory negligence are:

"[1.] The collision occurred . . . five hundred feet (500′) or more below the base of the clouds.

"[2.] Allegheny . . . failed to exercise ordinary care . . . under the circumstances in that plaintiff's aircraft was operated by its crew who failed to maintain a lookout for the Piper Cherokee 140 aircraft.

. . .

"[3.] Allegheny . . . failed to exercise ordinary care . . . under all circumstances . . . in that its crew conducted the aircraft descent from cruise altitude in an improper manner in that the rate of descent was in excess of five hundred feet (500′) per minute. . . .

"[4.] Allegheny . . . failed to exercise ordinary care . . . under all the circumstances . . . in that its crew conducted the aircraft descent from cruise altitude at a descent rate which was excessive under the circumstances through clouds and which did not permit the plaintiff's aircraft to be slowed to the required rate of descent of five hundred feet (500′) per minute at one thousand feet (1000′) above the assigned altitude of two thousand five hundred feet (2500′). . . .

"[5.] Allegheny . . . failed to exercise ordinary care . . . under all the circumstances . . . in that its crew failed to cause the plaintiff's aircraft to give way to the Piper Cherokee 140 aircraft which was

converging from the right of plaintiff's aircraft."

Based upon the foregoing findings the district court concluded that Allegheny violated common law and statutory duties of care which were a proximate cause of its injuries. As the following analysis will demonstrate, we are of the view that the district court's findings were clearly erroneous and not supported by substantial evidence.

The critical inquiry in resolving the question of Allegheny's contributory negligence is the distance below the clouds at which the Piper Cherokee aircraft was operating at the time of the collision. Resolution of the other issues as to rate of descent, duty to maintain lookout, and yield right of way are dependent upon the distance that the Cherokee was flying below the clouds. That is, Allegheny's liability for contributory negligence was directly related to its pilot's ability to see the other aircraft, assess the situation, and take any necessary evasive action to avoid collision.

▮ The district judge made no specific findings as to the altitude of the cloud formations or the altitude of the collision. However, he did enter the general finding that the collision occurred five hundred feet below the base of the clouds. The evidence appears certain, and the parties are agreed, that the collision altitude was approximately 3600 feet MSL. Inferentially therefore, the district judge found that the altitude of the clouds at the collision site was at a minimum of 4100 feet MSL. Without belaboring the point,[4] Allegheny has

---

The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).

It is provided in Rule 52(a) that:

 (a) Effect. In all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon.

. . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

4. Without recounting the testimony of the numerous witnesses and experts produced by plaintiffs, we only note that there was substantial evidence favorable to plaintiffs as to the altitude of the clouds. In addition, we agree with plaintiffs that the trial court erroneously excluded from the evidence the

produced an abundance of evidence to the effect that the altitude of the clouds at the collision site ranged between 3000 to 3900 feet MSL. Allegheny's evidence is persuasive that the Piper Cherokee aircraft piloted by Carey was closer to the clouds than the required distance of 500 feet and that the collision occurred less that 500 feet below the clouds if indeed it did not in fact occur in the clouds. Defendants urge that even in the face of this evidence, which is highly supportive of Allegheny's contention, the district court's finding was proper in view of the following evidence: A weather observation taken at Weir Cook Airport eleven minutes after the collision which placed the base of the clouds above the Indianapolis airport at 4197 feet MSL; the testimony of Allegheny's witnesses Robert F. Johannesen and Charles Bradley was to the effect that there was a layer of clouds extending at uniform height from Weir Cook Airport to the site of the accident. Although Johannesen and Bradley both testified to the uniformity of the cloud base they also testified that the cloud base was between 3500 to 3900 feet MSL. Moreover, Johannesen's observation about the uniformity of the cloud base was made thirty to forty minutes before the accident while Bradley's was made thirty to forty minutes after the collision. The 4197 foot cloud base measured at Weir Cook Airport eleven minutes after the accident was part of a weather formation drifting southeasternly toward the accident site which was some twenty nautical miles away and as such was part of a clearing in the weather coming from the northwest, while the worst weather was to the southeast at Bakalar. In our judgment the evidence emphasized by defendants cannot reasonably support the inference that at the time and place of the accident, twenty nautical miles southeast of Weir Cook Airport and eleven minutes before the weather observation at Weir Cook, the clouds above the accident site were at 4197 feet MSL. We do not think this evidence is of such persuasion as to avoid a determination that the court's finding was clearly erroneous.

■ Having overturned the district court's implicit finding as to the altitude of the clouds, we necessarily must set aside the court's findings as to Allegheny's duty to maintain a lookout and duty to yield right of way. We do so in light of the fact that an integral element to determining a breach of duty of lookout or failure to yield right of way is whether the Allegheny crew could have seen the Piper Cherokee in a reasonable time to avoid the collision. Most assuredly, if the Piper Cherokee was flying in the clouds at the time of the collision, so that little opportunity existed for Allegheny to see the other aircraft, defendants would be hard pressed to prevail on their affirmative defenses of failure to maintain lookout and yield right of way. Accordingly, findings on these issues are directly dependent on ascertaining the distance between the collision and the base of the clouds.

■ We must also set aside the district court's findings with respect to Allegheny's rate of descent through the clouds for these findings are likewise controlled by, albeit indirectly, the finding of the altitude of the clouds at the time of the collision and the Piper Cherokee's distance therefrom. Even assuming that Allegheny's rate of descent was excessive under the circumstances, it might be established at a full trial that the Piper Cherokee was flying so near to the base of the clouds that, even if the Allegheny pilot had descended at a lesser and more appropriate rate, he would, nevertheless not have had a reasonable time to see and react to the presence of the Piper Cherokee. Stated otherwise, based on findings of the altitude of the collision and cloud base, it might be established that Allegheny's alleged excessive rate of descent was not the proximate cause of its injuries.

stipulated interphone conversations between the Indianapolis Approach Control facility and the Bakalar Tower relating to the weather conditions at Bakalar.

In addition, we set aside, on an independent ground, the district court's finding as to the allegedly negligent nature of Allegheny's descent. There is no evidence in the record that substantiates the finding that Allegheny engaged in an excessive rate of descent. Indeed, the court's holding is contrary to the stipulation of the parties,[5] the uncontradicted testimony as to the custom and practice in the aviation industry,[6] and is contrary to the descent rate procedures recommended by the Federal Aviation Administration. Moreover, we agree with Allegheny that in determining whether the descent rate was excessive under the circumstances, it may appropriately be considered that Allegheny had a right to rely on controller McCammack properly performing his duties and advising the Allegheny crew of the presence of any small aircraft in their path. Likewise, an assessment of Allegheny's rate of descent must take into consideration that the Allegheny pilot need not have anticipated that the Piper Cherokee was being operated less than 500 feet from the base of the clouds in violation of VFR regulations.

Accordingly, for the foregoing reasons we hold that the district court erred in granting the Rule 41(b) motion to dismiss entered in favor of the United States. In so doing we must also hold as erroneous the grants of summary judgment entered in favor of Forth and the estate of Carey on the basis of collateral estoppel.[7]

### III

The district court, on defendants' motion, dismissed GECC as a party plaintiff on the basis that it was not a real party in interest. GECC was the owner of one of the engines mounted on the Al-

5. The parties entered into the following stipulation:
 "It is hereby stipulated and agreed by and between the parties that the rule of conduct in the aviation industry as of September 9, 1969, was as follows:
 "1. During any phase of flight, pilots are required to adhere to the following procedures whenever cleared by ATC to descend or climb to an altitude or flight level.
 "'If an altitude change of more than one thousand feet is required, descend or climb as rapidly as practicable to one thousand feet above or below the assigned altitude and then attempt to descend or climb at a rate of five hundred feet per minute until the assigned altitude is reached.'"

6. With respect to the custom and practice of the industry, it was error for the trial judge to exclude the testimony of American Airlines Captain Robert F. Johannesen as to the appropriate rate of descent. Johannesen's testimony as to the appropriate descent rate was highly relevant in that he had flown an American Airlines aircraft in the same area shortly before the accident with the same clearance.

7. Although we need not directly pass on the propriety of the district court's action in implementing the doctrine of collateral estoppel, we are impelled to say that we strongly disapprove of the procedure utilized. We recognize the oddity of the instant litigation —a simultaneous trial of two actions involving the same facts and issues whereas the judge is trier of fact as to one defendant (the United States)· while the jury is the trier of fact as to the remaining defendants. By entering a judgment on the merits for the Government and then applying the doctrine of collateral estoppel to preclude further action against the remaining defendants, the trial judge substituted his findings for those which should have properly been determined by the jury. Such a procedure, although otherwise proper in form, in substance short circuits plaintiffs' right to a trial by jury in an action where the evidence is such that it would be most inappropriate to fail to submit the case to the jury by entering a directed verdict. In such circumstances plaintiffs' right to trial by jury is rendered meaningless. Consequently, we are of the view that the application of the doctrine of collateral estoppel was improper in light of the peculiarities of this case. Rachal v. Hill, 435 F.2d 59 (5th Cir. 1970). The Government's case could be properly decided by the judge while at the same time plaintiffs' case against the remaining defendants should be submitted to the jury. Moreover, in an effort to avoid inconsistency in verdicts the better practice might be to submit plaintiffs' case to the jury which would function in two capacities: (1) it would render a verdict as to those defendants other than the Government, and (2) it would act as an advisory jury with respect to plaintiffs' case against the Government pursuant to the Federal Tort Claims Act.

legheny aircraft destroyed in the collision which it leased to Allegheny. As part of that leasing arrangement it was agreed that in the event of loss, GECC could demand a replacement engine from Allegheny. Pursuant to that provision, GECC did in fact receive a replacement engine from Allegheny. To the extent GECC received insurance proceeds due to the destruction of its engine, Allegheny and GECC entered into an agreement whereby GECC agreed to deposit the insurance proceeds in an escrow account pending delivery of the replacement engine.

The defendants in effect contend that since GECC obtained a replacement engine from Allegheny, GECC sustained no loss and was not therefore the real party in interest. Defendants' argument runs contrary to the collateral source rule which provides that compensation for loss which is received by a plaintiff from a collateral source independent of the wrongdoer cannot be utilized by the wrongdoer in mitigation of damages. *See, e. g.,* Powers v. Ellis, 231 Ind. 273, 108 N.E.2d 132, 135 (1952); Mason-Rust v. Laborers' International Union, Local 42, 435 F.2d 939, 945 (8th Cir. 1970).

■ The lease agreement between Allegheny and GECC was designed for the protection of GECC and not intended as a financial outlet for tortfeasors responsible for the loss. The purpose of the lease agreement is consonant with the purpose of the collateral source rule which is to prevent a defendant tortfeasor from taking advantage of efforts made by a plaintiff to protect himself from loss. Moreover, the collateral source rule rests on the premise that the tortfeasor is not to be punished twice for the identical, singular wrong. In view of the allegations of the complaint, made jointly by Allegheny and GECC, defendants would not be subject to future or multiple claims for loss of the engine. Accordingly, we hold that GECC was a real party in interest and that it was error for the district court to dismiss it from the action as party plaintiff.

## IV

Plaintiffs challenge the propriety of the district court's grant of a directed verdict in favor of Brookside Corporation, the parent and one hundred percent stock owner of Forth Corporation. Plaintiffs urge that Brookside had so dominated and controlled Forth that the latter had become an instrumentality of Brookside. Plaintiffs therefore contend that Brookside was properly charged with liability for the alleged torts of its subsidiary corporation. In our judgment the evidence, when viewed in the light most favorable to plaintiffs, is supportive of but one inference, namely, Forth Corporation was not a mere instrumentality of Brookside.

■ As we have indicated in our opinion in Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157 (7th Cir. 1963) a " 'parent corporation will be responsible for the obligations of its subsidiary when . . . the subsidiary has become its mere instrumentality.' " 324 F.2d at 160. In establishing the fact that a subsidiary is a mere instrumentality of its parent, we stated that the following elements must be proved: (1) control by the parent to such a degree that the subsidiary has become its mere instrumentality; (2) fraud or wrong by the parent through its subsidiary; and (3) an unjust loss or injury to the claimant. 324 F.2d at 160. We need not reach elements two and three for plaintiffs' case fails on the first element.

■ In ascertaining whether the requisite degree of control by the parent corporation is present so as to warrant a finding favorable to plaintiffs on the first element, we have considered the evidence as it relates to the presence or absence of the following factors:

"(a) The parent corporation owns all or most of the capital stock of the subsidiary.

"(b) The parent and subsidiary corporations have common directors or officers.

"(c) The parent corporation finances the subsidiary.

"(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

"(e) The subsidiary has grossly inadequate capital.

"(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

"(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

"(h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

"(i) The parent corporation uses the property of the subsidiary as its own.

"(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

"(k) The formal legal requirements of the subsidiary are not observed." 324 F.2d at 161.

The evidence demonstrates among other things that Forth was adequately capitalized and was engaging in business entirely dissimilar and disassociated with that of its parent (Brookside manufactured industrial fans); there was general adherence to the corporate formalities; Brookside's business with Forth amounted to only one percent of Forth's total business. There is no compelling evidence that Forth as a corporate entity had been reduced to a mere instrument of the parent. Indeed the evidence reflects that at the time of the collision Forth was, although a young organization, a viable independent corporation. To the extent control was exercised by the parent corporation, it was in our judgment no more than what might be expected as necessary for the proper protection of an investment. Accordingly, we affirm the district court's grant of a directed verdict in favor of Brookside.

V

Plaintiffs challenge as erroneous the following rulings by the trial judge: (1) the district court directed a verdict in favor of Forth on plaintiffs' specification of negligence that Forth was responsible for the negligent acts of Robert W. Carey by reason of the fact that Carey and Forth were engaged in a joint enterprise; (2) the district court struck from plaintiffs' complaint various allegations of negligence which asserted that Forth was responsible for the negligent acts of Carey pursuant to Burns' Indiana Statutes, §§ 14–901, 14–106 and 14–109, IC 1971, 8–21–3–1, 8–21–4–5, 8–21–4–8, (3) the district court directed a verdict in favor of Carey's estate on plaintiffs' specification of negligence that Carey failed to properly plan his flight in that the planned route crossed the descent area utilized by IFR aircraft landing at Weir Cook Airport; and (4) the district court directed a verdict in favor of Forth on plaintiffs' specification of negligence that Forth improperly trained Carey.

With respect to plaintiffs' claim that Carey and Forth were engaging in a joint enterprise, we are of the opinion that plaintiffs had made out a prima facie case warranting submission to the jury. The essential elements of a joint enterprise are: (1) A community of interest in the object and purpose of the undertaking; (2) an equal right to direct and govern the conduct of the other participant in respect thereto; and (3) a contract, either express or implied, to that effect. Jones v. Hernandez, 148 Ind.App. 17, 263 N.E.2d 759, 763 (1970). The evidence establishes that Forth and Carey had undertaken a joint enterprise with the objective of obtaining Carey's private pilot's license and that the specific flight resulting in the mid-air collision involved the joint

efforts of both in furtherance of their common goal. As to the "community of interest in the object or purpose" requirement, both Carey and Forth were seeking the common objective of obtaining a private pilot's license for Carey. Carey's interest was obvious, his personal convenience and to satisfy his desire to learn to fly. Forth's interest in Carey's success was reflected in the additional business to be derived from Carey as a pilot and other potential pilots who might be drawn to Brookside for training. More important, however, was the fact that Forth's existence as a flight school depended in part on the success of Carey and other student pilots like him in obtaining their private pilot's license on their first attempt. See 14 C.F.R. § 141.11(a)(1). With regard to the second requirement that there be "an equal right to direct and govern the conduct of the other," Carey had control over the goal of obtaining his private pilot's license in that he alone had the power to determine his rate of progress by the frequency and timing of his flying. Forth had control over Carey which emanated from the instructor-student relationship. In addition, Forth was under an affirmative obligation under the federal air regulations to supervise and control all facets of Carey's training. Moreover, in view of the hazardous nature of Carey's undertaking and his status as a student pilot, we reject any notion which urges that equal control can be established only by a showing of joint presence of the parties at the time of the alleged wrongdoing. Both Carey and Forth had equal control over the attainment of the common objective of securing Carey's private pilot license. The last element of a joint enterprise, "a contract, express or implied" is sufficiently established on the basis of the actions of the parties as well as the express agreements entered into between Forth and Carey.

Addressing plaintiffs' second contention of trial court error we agree that it was improper for the district judge to strike those allegations of plaintiffs' complaint charging Forth with the legal responsibility of Carey's alleged negligence pursuant to Burns' Indiana Statutes §§ 14–901, 14–106 and 14–109. A fair reading of sections 14–901(h) and 14–109 [8] charges the absentee owner with the responsibility for the careless and reckless operation of his aircraft by another. While no Indiana cases have interpreted these sections, we note that virtually identical sections in aeronautical statutes of other states have been interpreted to impose liability upon the absentee owner. Hays v. Morgan, 221 F.2d 481 (5th Cir. 1955); Lamasters v. Snodgrass, 248 Iowa 1377, 85 N.W.2d 622 (1957); Hoebee v. Howe, 98 N.H. 168, 97 A.2d 223 (1952). We find the foregoing decisions persuasive and agree with plaintiffs that if the Indiana courts had occasion to confront this issue, they would properly interpret sections 14–901(h) and 14–109 as holding the absentee owner financially responsible for the negligent acts of a student pilot to whom he had granted the use of his aircraft. Ross v. Apple, 143 Ind.

---

8. It is provided in section 14–901(h):

"(h) Operation of aircraft or operate aircraft—the use of aircraft for the purpose of air navigation, and includes the navigation or piloting of aircraft. Any person who causes or authorizes the operation of aircraft, whether with or without the right of legal control (in the capacity of owner, lessee, or otherwise) of the aircraft, shall be deemed to be engaged in the operation of aircraft within the meaning of the statutes of this state."

Section 14–109 states that:

" * * * It shall be unlawful for any person to operate an aircraft in the air, or on the ground or water in a careless or reckless manner so as to endanger the life or property of another; or to operate an aircraft in the air, or on the ground or water with reckless disregard for the safety, property, or rights of others. * * * In any proceeding charging careless or reckless operation of aircraft in violation of this section, the court in determining whether the operation was careless or reckless shall consider the standards for safe operation of aircraft prescribed by federal statutes or regulations governing aeronautics."

App. 357, 240 N.E.2d 825, rehearing denied 241 N.E.2d 872 (Ind.App.1968).[9]

 Lastly, we treat together plaintiffs' challenges to the directed verdicts granted in favor of the estate of Carey and Forth which dealt with certain of plaintiffs' specifications of negligence. Plaintiffs had contended Carey was negligent in planning his flight through the descent area utilized by IFR aircraft landing at Weir Cook Airport. They also claimed that Forth improperly instructed Carey as to various pertinent aspects of flying. On the evidence before us these matters should have been submitted to the jury for determination and not disposed of by way of a directed verdict.

The judgment in favor of Brookside Corporation is affirmed.

The judgments in favor of the remaining defendants are reversed and the causes are remanded for a new trial under the provisions of Circuit Rule 23.

---

9. Pursuant to Burns' Indiana Statute § 14–106 plaintiffs have presented facts sufficient to make out a case of negligent entrustment by Forth. Accordingly, this is a matter which should properly be submitted to the jury.