**RIVERWAY COMPANY,**
Plaintiff-Appellee,

v.

**TRUMBULL RIVER SERVICES, INC.,**
Defendant-Third Party Plaintiff,
Appellee-Cross-Appellant,

v.

**CAIRO MARINE SERVICE, INC.,** Third
Party Defendant-Appellant.

Nos. 81–1515, 81–1612.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 12, 1981.
Decided March 17, 1982.

W. J. Larzelere, Jr., New Orleans, La., for third party defendant-appellant.

Gary Mayers, Thompson & Mitchell, East St. Louis, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Circuit Judge, WOOD, Circuit Judge, and GRANT,[*] Senior District Judge.

GRANT, Senior District Judge.

This action originated with a complaint filed by Riverway Company (hereinafter "Riverway") on July 27, 1978, which alleged that Barge RW-381, owned by Riverway, sunk as a result of the negligence of Trumbull River Services, Inc. (hereinafter "Trumbull"), while the barge was in the care, custody and control of Trumbull. The

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

district court found that the subject matter of the complaint was within its admiralty and maritime jurisdiction under 28 U.S.C. § 1333 and Fed.R.Civ.P. 9(h). On October 11, 1978, Trumbull filed an answer to Riverway's complaint and a third-party complaint against Cairo Marine Service, Inc. (hereinafter "Cairo") under Fed.R.Civ.P. 14(c), which alleged that the sinking of the barge "occurred as a result of the primary and active fault, negligence and carelessness of Cairo. . . ."

The action was tried without a jury on January 26 and 27, 1981. Judgment was entered against Trumbull and Cairo jointly and severally in the amount of $111,350.10, plus prejudgment interest in the total amount of $33,329.04. The district court further concluded that Trumbull's negligence was two-thirds responsible for the sinking of the barge and Cairo's negligence was one-third responsible. Ultimate responsibility for the total damages was apportioned according to these percentages. Both Trumbull and Cairo appeal from the district court's decision. Each claims the other should be assessed full liability.

I.

Riverway is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota and its operation offices in St. Louis, Missouri. It is engaged in the business of owning and operating barges on inland rivers of the United States. Trumbull is an Illinois corporation with its only office and place of business in Lacon, Illinois. It operates a fleeting and harbor service business on the Illinois River near Lacon. Cairo is an Illinois corporation with its principal place of business in Cairo, Illinois. It is engaged in the business of marine surveying, consulting and salvage on the inland rivers.

At the time of the events underlying this suit, Riverway was the owner of Barge RW–381 which was used for the transportation of bulk cargo. On January 16 and 17, 1978, about nine miles up the Illinois River from Lacon, Illinois, this barge was loaded with approximately 50,000 bushels of corn.

The barge was then transported on January 18, 1978, to one of Trumbull's fleets and moored alongside Barge MWT–122 and fastened to it by a steel cable.

On that same morning, severe ice conditions forced Trumbull to suspend its fleet operations. Before doing so, it sent some employees on a final inspection of all the barges. Nothing unusual was discovered regarding either MWT–122 or RW–381, even though MWT–122 had previously been taking on water. Trumbull suspended all operations as of noon that day. It did institute a radio monitoring system whereby passing towboats were requested to advise Trumbull whether any of the barges were experiencing difficulty. On January 20, 1978, a towboat reported to Trumbull that MWT–122 and RW–381 looked somewhat low in the water. On January 22, 1978, Trumbull was advised that MWT–122 was very low in the water. No reports after January 20, 1978, indicated that RW–381 appeared low in the water.

On January 23, 1978, a towboat advised Trumbull that RW–381 had little freeboard. With some improvement in the weather conditions and the sighting of a greater number of towboats passing through Lacon that morning, Trumbull decided to temporarily resume operations and dispatched the M/V NIANTIC to check the fleet, primarily RW–381. The NIANTIC arrived at RW–381 around 12:30 p. m. The barge was boarded and inspected. Although one compartment had taken on some water, it was characterized as normal condensation. The most troublesome discovery was that MWT–122 was completely submerged immediately to the port side of RW–381. The cable connecting the two barges was under strain and appeared to be pulling or holding down RW–381's port stern corner. Apparently, RW–381 was not in any imminent danger of sinking at that time.

No crew member of the NIANTIC took any action regarding the cable connecting the two barges. Edward Trumbull, Trumbull's general manager, was soon informed of RW–381's condition. He immediately notified Riverway and advised it that

Trumbull would not assume any further responsibility for the safety of RW–381 under those conditions. Trumbull, in fact, did not take any further action with respect to RW–381.

After receiving Trumbull's report of RW–381's condition, its disclaimer of responsibility and refusal to take necessary action, Riverway quickly hired Cairo to act as its representative with respect to RW–381. More specifically, the district court found that Cairo was hired "to send a surveyor to Trumbull, take charge of the situation, inspect RW–381, determine what needed to be done, and do whatever needed to be done or arrange for others to do whatever needed to be done to keep RW–381 from sinking."

Late in the afternoon of January 23, 1978, Cairo called and informed Trumbull that it had been hired by Riverway and that a surveyor would arrive that evening. Edward Trumbull told his employees that they were to transport the surveyor to RW–381 and to provide him with their full cooperation. He specifically highlighted his view that the surveyor was to be in charge of the situation.

The surveyor who arrived on the scene was Peter Rukes. At about 7:30 p. m. that evening he was taken on the NIANTIC to RW–381 where he conducted an inspection of the barge. The condition of the barge at that time was described as follows by the district court:

> At this time, the port stern corner of the barge was approximately 3″ under water, and there was about 1 foot of freeboard at the starboard stern corner. Rukes and Roberts inspected the void compartments of the RW–381. They observed that there was no appreciable water in the stern compartment. The starboard # 3 compartment contained about 9′ of water; the port # 3 compartment apparently was nearly full of water, because the barge was listing to port and water was entering through the submerged manhole cover of that compartment. The # 2 port compartment contained approximately 18″–24″ of water, which was en-

tering through a fracture in the bulkhead between the # 3 compartment and the # 2 compartment. Rukes obtained several wooden shingles from aboard the NIANTIC and drove them into the bulkhead fracture, apparently stopping the leak. Inspection of the other void compartments did not reveal any water in them.

When Rukes and Adams, a Trumbull employee, returned to the NIANTIC they discussed the barge's condition. The two versions were in conflict and the district court credited the testimony of Adams. Adams told Rukes that the mooring cable should be cut so that the sunken MWT–122 would not pull down or hold down the port stern corner of RW–381. Adams also advised Rukes that an ax was aboard the ship to perform the task and that he would even do it. Rukes stated that he was not concerned with the possibility RW–381 would sink that night and that he would attend to it the next morning. Adams offered to pump the water out of RW–381's compartments, but Rukes stated that it would not be necessary and reiterated that he would attend to it the next morning. An important finding by the district court was that "[s]ince Rukes had been sent by Riverway as the 'expert' and the man in charge of the situation on behalf of Riverway Company, Adams deferred to Rukes' judgment." The court also found in light of conflicting testimony that Rukes had failed to even report to Riverway the results of his on-site inspection of RW–381. Upon returning to shore, Rukes immediately left for his motel.

The next morning Rukes, along with some Trumbull employees, proceeded to RW–381. They discovered that the situation had drastically changed for the worse in that the barge was now approximately ½ to ⅔ sunk at its stern end. In this condition, it was impossible to prevent total sinking. Upon his initial observation, the district court found that Rukes:

> began swearing at himself, stated that the wire should have been cut the night before, stated that it was no one's fault but his own that the wire had not been cut, and, in his own words "blamed my-

self for the whole situation." The men then returned to the Trumbull office where Rukes, in an apparent state of rage, threw his hat on the floor and admitted that he had "just sunk a barge."

The barge was not salvaged until March, 1978. The evidence showed that an examination of the barge revealed various cracks and fractures in several places but that they were insufficient to have rendered the barge unseaworthy or to cause the barge to sink as it did. The district court specifically found that:

RW-381 was delivered to Trumbull in a seaworthy condition and that it sank because of the failure to sever the mooring wire between RW-381 and MWT-122, or the failure to pump the water out of the barge compartments on the night of January 23, 1978, or both.

## II.

Before examining the apportionment of liability issue which both parties contend was incorrectly decided by the district court, it is necessary to first examine the respective conduct of each party separately to determine whether their conduct, viewed in isolation, constituted negligence as was found by the district court.

### Trumbull

Neither party challenges the district court's finding that a bailment relationship existed between Riverway and Trumbull with respect to RW-381. As such, Trumbull had the duty to be free of negligence and to exercise reasonable care over the barge while it was in its exclusive care, custody and control. *See United Barge Company v. Notre Dame Fleeting & Towing*, 568 F.2d 599, 601-02 (8th Cir. 1978); *Matter of Flowers*, 526 F.2d 242, 244 (8th Cir. 1975); *Stegemann v. Miami Beach Boat Slips, Inc.*, 213 F.2d 561, 564 (5th Cir. 1954); *Selame Associates, Inc. v. Holiday Inns, Inc.*, 451 F.Supp. 412, 419 (D.Mass. 1978). Trumbull contends that it was free from negligence throughout this entire matter. Under the clearly erroneous standard this court must apply to district court

findings with respect to negligence, *Allegheny Airlines, Inc. v. United States*, 504 F.2d 104, 108 (7th Cir. 1974), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 470 (1975), *Grayson v. Cordial Shipping Co.*, 496 F.2d 710, 717 (7th Cir. 1974), we reject that argument and affirm the district court's finding that Trumbull failed to fulfill its duty.

Trumbull was first placed on notice of some possible problems with RW 381 on January 20, 1978, when a towboat reported that the barge looked low in the water. Action was not required at that time, but Trumbull was at least made aware of a possible abnormal situation. In the early afternoon of January 23, 1978, more disturbing information about RW-381 was received by Trumbull and the NIANTIC was dispatched to inspect. The gravity of the potential danger to the barge is highlighted by the fact that Trumbull dispatched the NIANTIC even though the weather, while somewhat improved, was still severe. Although the inspection revealed no imminent danger of sinking, the situation was far from one which required no action to be taken at all. We agree with the district court's conclusion that "some action should have been taken at that time."

Consideration should have certainly been given to the need for cutting the cable connecting the RW 381 and MWT-122 which was completely submerged. The evidence showed that RW-381's port side was being pulled or held down as a result which could have led and apparently did lead to the barge taking on water. Under these circumstances, preparation for the possible pumping of the barge should also have been undertaken and periodic inspections would have been called for in light of the real potential that the barge's condition might quickly worsen. The coupling of the notice of January 20, 1978, and the circumstances found on the afternoon of January 23, 1978, required that some type of action be taken. Trumbull failed to do anything even though it had ample time and the means to do so. Had Trumbull taken any of the above actions that afternoon, it is possible that the

barge's condition would not have worsened and the sinking prevented.

Additional evidence of unreasonable conduct by Trumbull was its report to Riverway of RW–381's condition and its refusal to assume any further responsibility with respect to the barge. As bailee and still with exclusive possession and control of the barge, it could not unilaterally disclaim any further responsibility. This unilateral refusal to take reasonable and necessary action constituted a breach of its duties as bailee. *See Martin Marietta Corp. v. Peter Kiewit Sons' Co.*, 346 F.Supp. 892, 894 (E.D. N.Y.), *aff'd*, 472 F.2d 1404 (2d Cir. 1972); *Mid-America Transportation Co. v. St. Louis Fleeting Service, Inc.*, 229 F.Supp. 409, 411 (E.D.Mo.1964), *aff'd*, 348 F.2d 920 (8th Cir. 1965). Moreover, Trumbull cannot now be heard to claim that no action was required that afternoon when its telephone conversation with Riverway indicated quite the otherwise.

The condition of the barge found later that evening by Trumbull also supports a finding of unreasonable conduct. The evidence shows that remedial action was absolutely necessary to prevent the barge from sinking. This case is in sharp contrast to *Midland Enterprises, Inc. v. Notre Dame Fleeting & Towing Service, Inc.*, 538 F.2d 1356 (8th Cir. 1976), where the court concluded that it was unlikely anyone would have noticed through a normal inspection that there was anything particularly wrong with the barge. Trumbull admits both the need for action, its ability and willingness to take action and its failure to take any. It argues, however, that its duty as bailee to exercise reasonable care was extinguished by the appearance of Rukes on the scene and the specific responsibilities which he was assigned.

We must disagree with Trumbull's position. Rukes' appearance did not affect Trumbull's status as bailee and its corresponding duty to exercise reasonable care over the barge on the evening of January 23, 1978. However, it did have an effect on what reasonable care would entail. Trumbull argues that because Rukes possessed the responsibility to take all necessary action to save the barge, its duty to take such action was extinguished. We are mindful of the bailment principle that when the owner remains with the bailed property or has an independent agent responsible for it or for certain aspects of its care, there is a corresponding limitation on the bailment and the duty of the bailee. *See Stegemann*, 213 F.2d at 565. In this case, however, we agree with the district court that "Trumbull's responsibility for the barge did not terminate with Rukes' arrival."

Whatever effect Rukes' appearance had on Trumbull's duties as bailee must be ascertained from the intent of the parties to the bailment based on all of the circumstances. The evidence here indicates to this court that Riverway did not intend and Trumbull should not have understood that the hiring of Cairo absolved Trumbull of its duty to take reasonable and necessary action to prevent the barge from sinking. It is critical to initially recognize that the primary reason why Cairo's services had to be secured in the first place was because Trumbull informed Riverway that it refused to take any remedial action. Absent this obvious breach of bailment duties, Cairo quite likely would have never become involved in this matter. We will not permit Trumbull to lay the responsibility for taking reasonable and necessary action to save the barge exclusively on Cairo as a result. Moreover, we are unwilling to conclude under these circumstances that Trumbull's duty to exercise reasonable care over the barge did not encompass taking reasonable and necessary action to save the barge throughout the evening of January 23. While Rukes was at the barge and considering what action needed to be taken, Trumbull's duty to exercise reasonable care did not require it to cut the cable or pump the barge. That duty during that time belonged exclusively to Rukes. However, when Rukes refused to take any action, Trumbull's duty to exercise reasonable care then required it to take those actions. Sitting idly by while knowing action was required does not constitute reasonable and prudent conduct in light of what transpired

earlier that afternoon between Riverway and Trumbull and the imminency of grave danger to the barge. This is especially true here inasmuch as the problems experienced by the barge had been created by Trumbull's failure to act earlier in the day and the actions which were necessary to save the barge could have easily and immediately been performed.

It is true that Rukes instructed the Trumbull employees not to take any action with respect to the barge. Generally, such an instruction would also have extinguished Trumbull's duty to cut the cable and pump the barge. But in this case, the seriousness and imminency of the danger to the barge as well as Trumbull's admitted knowledge that action was absolutely and immediately necessary outweigh application of this general rule. Furthermore, the amount of control which Riverway vested in Cairo was unknown to Trumbull. Trumbull was never hired or directed by Riverway to obey the commands of Cairo. Trumbull never even spoke with Riverway about Cairo. Even when advising Trumbull that it had been hired by Riverway, Cairo did not state that it was to be in exclusive control of the situation. In light of this apparent confusion in responsibilities, Trumbull at the very least had the obligation to call Riverway and inform it of the condition of the barge as well as Rukes' failure to act. For all of these reasons, we conclude that Trumbull had the duty to cut the cable or pump the barge on the evening of January 23, irrespective of Rukes. It failed to do so. Such conduct was unreasonable and constituted a breach of its duties as bailee.

■ Trumbull's final argument is that Rukes' failure to take necessary action and his instruction to Trumbull employees not to take any action were the sole causes of the sinking of the barge. We find no error in the district court's finding that Trumbull contributed to the sinking. As previously discussed, Trumbull continued to possess the duty to exercise reasonable care over the barge on the evening of January 23, 1978, even after Rukes' appearance. The evidence shows that this duty included the

cutting of the cable or the pumping of the barge. Such action would have prevented the sinking. Thus, Trumbull's failure to perform these acts was a contributing cause to the sinking. The fact that Rukes possessed the duty to perform these same acts does not change this finding. Each were concurrent and independent causes.

### Cairo

■ As established earlier, there is no question based upon the evidence that the condition of the barge on the night of January 23, 1978, indicated that action was necessary and none was taken by Rukes. The critical question which must be addressed is whether Rukes had a duty to take any action. In this regard, we must carefully examine the district court's finding that Cairo was hired to "take charge of the situation, inspect RW–381, determine what needed to be done, and *do whatever needed to be done or arrange for others to do whatever needed to be done to keep RW–381 from sinking.*" (emphasis supplied).

Cairo argues in general terms that marine surveyors sent to a scene of distress do not possess the authority or ability to take remedial action and that, therefore, in this case, Rukes did not have any duty to cut the cable or to pump water out of the barge. This court will not engage in a general discussion of the duties and responsibilities assumed by a marine surveyor upon arrival. We will limit ourselves to the specific contractual responsibilities assumed by Cairo in this specific instance as established by the evidence.

We reject Cairo's claim that there is no evidence to support the finding that Cairo undertook a responsibility to salvage, protect and keep the barge from sinking. The testimony at trial from representatives of Riverway (Tr. 78, 88), an expert witness on behalf of Trumbull (Tr. 447- 48), an expert witness on behalf of Cairo (Tr. 521 -22), and Rukes himself (Tr. 156–57, 160), sufficiently establish that as the surveyor sent by Cairo, Rukes had the responsibility to take any action reasonable and necessary to prevent the barge from sinking. Cairo was hired to

conduct an inspection *and* to take appropriate remedial action. Everyone knew that. Otherwise, it is difficult to understand why Riverway would have even hired Cairo and why Cairo accepted after being briefed and realizing that the situation might likely demand more than it was prepared and able to give. Furthermore, the conduct of Rukes at the barge site is inconsistent with Cairo's claim that Rukes was sent only to investigate. He did not deny that he had the authority or responsibility to take action that evening. He merely postponed taking action until the next morning. Thus, Rukes in fact acknowledged that he possessed the responsibility to take action. The credited evidence also shows that Rukes failed to report to Riverway what he found that evening. Surely such a report would be the least responsibility assumed by Cairo under these near crisis conditions. Simply stated, Cairo did absolutely nothing after being hired by Riverway.

For these reasons, we find there to be sufficient evidence in the record to support the district court's conclusion regarding the scope of Rukes' duties. Inasmuch as Rukes admits that he failed to sever the wire cable between RW–381 and MWT–122, and also failed to have RW–381 pumped, and as the district court found, he expressly instructed the Trumbull employees not to do either, we find that Rukes breached his duty to act.

■ In its written decision, the district court analogized the relationship of Cairo to Riverway with the relationship between a salvor and a ship in distress. Once a salvor is hired to render assistance to a ship in distress, the salvor must exercise reasonable care for the vessel to rescue it from a distressed condition. *The Noah's Ark v. Bentley & Felton Corp.*, 292 F.2d 437 (5th Cir. 1961); *The Cape Race*, 18 F.2d 79 (2d Cir. 1927). Cairo too was hired in this instance to render assistance to a barge in distress. Therefore, Rukes was required to exercise reasonable care. Cairo objects to the district court's analogy by citing *Great American Insurance Co. v. Bureau Veritas*, 338 F.Supp. 999 (S.D.N.Y.1972), *aff'd*, 478 F.2d 235 (2d Cir. 1973) and *Steamship Mutual Underwriting Ass'n, Ltd. v. Bureau Veritas*, 380 F.Supp. 482 (E.D.La.1973), which addressed the general duties and responsibilities of a marine surveyor. We find these cases inapplicable. Our single concern is what the evidence establishes as the responsibilities Cairo assumed by its contract with Riverway. The status or title of Rukes is unimportant where the evidence defines the specific responsibilities Cairo assumed. As discussed previously, the responsibility in this case called for more than simply looking over the situation.

■ Cairo's final argument is that Rukes' failure to take any remedial action with respect to the barge was not the proximate cause of its sinking. For the same reasons which applied to Trumbull's identical argument, we must disagree. Rukes had the contractual duty to take reasonable and necessary remedial action to save the barge. This included the cutting of the cable and the pumping of the barge or instructing others to do the same. Failure to do so, especially in instructing the Trumbull employees not to take action, contributed to the sinking. Thus, Rukes' conduct was a contributing cause of the sinking. The fact that Trumbull possessed and failed this same duty as bailee does not change this conclusion. As stated earlier, Trumbull's and Rukes' conduct each were concurrent and independent causes.

### Apportionment of Liability

Having concluded that both Trumbull and Cairo failed to exercise reasonable care and that their actions contributed to the sinking of the barge, we must examine the apportionment of liability made by the district court. It concluded that:

> [u]nder all of the circumstances of this case, the court concludes that the negligence of Trumbull River Services, Inc. was two-thirds responsible for the sinking of Barge RW–381, and the negligence of Cairo Marine Service, Inc. was one-third responsible for the sinking of Barge RW–381.

■ Cairo contends that even assuming Rukes was negligent, Trumbull must be fully liable as bailee for the loss suffered by Riverway. It argues that inasmuch as Cairo could not be liable to Trumbull in the third party action, it cannot therefore be assessed direct liability for any portion of Riverway's loss.

The procedural structure of this admiralty action is governed by Fed.R.Civ.P. 14(c), which provides:

> (c) *Admiralty and Maritime Claims.* When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. *In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff,* in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff.

(emphasis supplied). The unique features of Rule 14(c) which distinguishes it from traditional third-party practice are described in 3 J. Moore, Federal Practice ¶ 14.34 (2d ed. 1980):

> A third-party defendant may be brought in not only on a theory of liability over to the third-party plaintiff for any recovery the original plaintiff may secure from such third-party plaintiff (the original defendant), but also on a theory that the third-party defendant is directly liable to the original plaintiff either jointly with the original defendant or instead of the original defendant.

(footnotes omitted). *See also Rosario v. American Export-Isbrandtsen Lines, Inc.,* 531 F.2d 1227, 1231–32 (3d Cir.), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); *Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Company,* 410 F.2d 178, 186–87 (5th Cir. 1969); *MISR Insurance Company v. M-V Har Sinai,* 80 F.R.D. 438, 440 (S.D.N.Y.1978); *Northern Contracting Co. v. C. J. Langenfelder & Sons, Inc.,* 439 F.Supp. 621, 623 n.1 (E.D.Pa. 1977); *Stinson v. S. S. Kenneth McKay,* 360 F.Supp. 674, 675 (S.D.Tex.1973). This interpretation of Rule 14(c) was made clear in *Ohio River Company v. Continental Grain Company,* 352 F.Supp. 505, 512 (N.D.Ill. 1972). There, the district court reasoned in part as follows:

> If the contention of Oil Transport [third-party defendant] were correct, either a separate suit for contribution or repetitious pleadings and testimony on the part of the plaintiff and the third-party plaintiff would be necessary in the original trial. *Such cannot be the meaning of Rule 14(c). The rule provides instead that the third-party plaintiff may demand judgment against the third-party defendant in favor of the plaintiff and shall be construed as meaning precisely that.* Ohio River [plaintiff] is thus entitled to recover its damages from both Continental [third-party plaintiff] and the Bayou La Reine [third-party defendant].

(emphasis supplied).

In its third-party complaint against Cairo, Trumbull prayed for the following:

> (1) That process in due form of law, according to the practice of this Court in causes of admiralty and maritime jurisdiction pursuant to the provisions of Rules 4 and 14(c) of the Federal Rules of Civil Procedure, issue against Third Party Defendant Cairo Marine Service, Inc. requiring it to appear and answer this Third Party Complaint and answer the Complaint of Plaintiff;

As in *United States v. Isco, Inc.,* 463 F.Supp. 1293 (E.D.Wis.1979), we believe the unmistakable meaning of this language was to designate Cairo as a defendant to Riverway's complaint. Thus, the district court

properly applied Rule 14(c) and was correct in treating this action as if Riverway had commenced it against Cairo and Trumbull as joint defendants.

■ The last issue we must address is the percentage allocation made by the district court. There is ample support in the record to support an equal allocation of liability. However, we also conclude that there is ample support for the district court's allocation. Greater culpability can be found in Trumbull in two regards. First, it had the opportunity to take preventive action on the afternoon of January 23 but failed to do so. The most obvious action would have been to sever the connecting cable between RW–381 and the submerged barge MWT–122. Second, it breached its duties as bailee by informing Riverway it would not assume any further responsibility for the barge. Our review of the district court's allocation of liability is governed by the same "clearly erroneous" standard as was our review of the district court's negligence findings. For the reasons above, we conclude the district court's allocation, "under all of the circumstances of this case," satisfies this standard.

The decision of the district court is AFFIRMED in all respects.

HARLINGTON WOOD, Jr., Circuit Judge, concurring in part, dissenting in part.

In all respects, I concur in Judge Grant's careful analysis of this barge incident up to the final paragraph concerning the allocation of liability. At that point, I respectfully dissent, but only by one notch.

As Judge Grant fairly points out, there is ample support in the record to justify an equal allocation of liability between Trumbull and Cairo. As it now stands, however, Trumbull is assessed two-thirds of the liability and Cairo the remaining one-third.

It was Cairo's man Rukes who was dispatched to the scene "to take charge of the situation." He arrived in time and had the means at his disposal to save the barge, but he had a more compelling interest that night waiting at his motel. When Rukes

returned the following morning, it was too late. The trial judge found that Rukes admitted that he "had just sunk the barge." That unavoidable candor should not save his company from its full share of liability.

In reviewing the factual findings in a close case, you must remind yourself that you are not the district judge who presided at the trial, only a reviewing judge looking at the record, and bound by the clearly erroneous standard. I believe, however, in the circumstances of this case that justice would be a little more equal by an equal division of liability.